[No. B005434. Second Dist., Div. Seven. Feb. 27, 1985.]

COMPTON COMMUNITY COLLEGE FEDERATION OF TEACHERS, AFT LOCAL 3486, AFL-CIO, Plaintiff and Appellant, v. COMPTON COMMUNITY COLLEGE DISTRICT et al., Defendants and Respondents.

COUNSEL

Lawrence Rosenzweig for Plaintiff and Appellant.

O'Melveny & Myers, Richard N. Fisher, Diane B. Patrick, Jones & Matson, Urrea C. Jones, Jr., Stephan K. Matson, De Witt W. Clinton, County Counsel, Allan B. McKittrick, Assistant County Counsel, Steven J. Carnevale and Paula A. Snyder, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**JOHNSON, J.**—This case poses an issue of considerable importance to teachers and school districts. Many districts unilaterally cut teacher salaries during a contract year in order to adjust to lower revenues and then bar the teachers from recovering their lost salary payments in later years by invoking a constitutional provision which prohibits local districts from using income from one fiscal year to pay obligations incurred in another fiscal year. We conclude the answer is no and thus reverse the trial court's refusal to grant mandamus to the teachers.

### I. FACTS AND PROCEEDINGS BELOW

In the spring of 1982 the Compton Community College District (the District) engaged in collective bargaining negotiations with its teachers represented by the Compton Community College Federation of Teachers, AFT Local 3486, AFL-CIO (the Teachers). On March 9, 1982, the parties signed an agreement covering the current academic year (1981-1982) and the next year (1982-1983). Among other things this agreement called for salary raises of 8.7 percent for part-time faculty and 8.5 percent for full-time faculty. These raises were to be retroactive to the beginning of the current fiscal year, July 1, 1981.

The District implemented the prospective raises immediately. However, it delayed payment of the retroactive portions of the agreed-upon compen-

sation clauses of the contract. Finally, on June 18, 1982, the Teachers' lawyer wrote the District requesting compliance. Receiving no response, the Teachers filed a formal grievance against the District on June 22, 1982. At that point, the District concluded it was over $400,000 short of the revenues needed to honor the retroactive component of its contractual obligations to its Teachers.[1] Nonetheless, on July 2, the District responded to the grievance with a letter promising "to have a more accurate estimate of both the amounts and dates of income receipts" and to "attempt to establish the most reasonable early target date for issuance of retroactive checks."

At the same time it was refusing to pay its faculty members their retroactive raises the District was busy borrowing funds to discharge other obligations accumulated during 1981-1982. Education Code section 84309 authorizes education districts to obtain emergency apportionments from the state when income is not enough to meet expenses. Pursuant to this authority, the District sought and received a $750,000 "revenue apportionment advance" from the state to meet its 1981-1982 obligations. Later this advance was converted into a loan payable over the three years.

During summer and fall 1982 the District made some attempts to honor its contractual obligations to its faculty. At a special board meeting on July 19 the District expressed "its intention to adopt a resolution authorizing a one-time, lump-sum bonus payment to eligible employees in connection with the retroactive emoluments approved by the board earlier in the year. Payment is to be made from 1982-83 revenue as soon as funds are available and legal requirements for their disbursement have been met." On August 24 the District superintendent went so far as to prepare a resolution for board approval authorizing payment of bonuses to all employees who were due retroactive raises. These bonuses were to come out of 1982-1983 income. However, before he could proceed further he received an opinion from the county counsel's office. The opinion stated payment of the bonuses would violate the debt limitation found in article XVI, section 18 of the California Constitution. This constitutional provision prohibits local government bodies—including school boards—from "incur[ring] any . . . liability . . . exceeding in any year the . . . revenue provided for such year . . . ." (Cal. Const., art. XVI, § 18.)

---

[1]The reasons for the 1981-1982 revenue shortfall were three-fold. (1) The District made a $409,000 "accounting error" in calculating the carryover available from the 1980-1981 academic year. (2) Nonresident tuition was $325,000 less than anticipated because fewer nonresidents attended than the District expected. (3) The state government caused a $779,000 revenue loss by imposing a cap on enrollment-based state payments to community colleges.

Despite the county counsel's advice, the District board on September 14 ordered $350,000 in warrants to be issued to those employees who were owed retroactive salary payments. The order for warrants was submitted to the Los Angeles County Superintendent of Schools (the County Superintendent), who also is a respondent in the instant case. On September 16 the county division of school financial services issued a notice of nonapproval rejecting the District's warrants. The County Superintendent also based this decision on article XVI, section 18 of the California Constitution.

The District's financial crisis continued through the 1982-1983 academic year. At some point during the year the District, which until that time had been striving to honor its contractual commitment to its faculty, shifted positions. The District began contending it could not afford to reimburse its teachers for the retroactive salary raises it failed to pay during 1981-1982.

On October 7, 1982, the Teachers filed a petition for peremptory writ of mandate in superior court against the District, the board of trustees of the District, the District's president and the county superintendent. The petition sought an order requiring the respondents to pay the full compensation the District had contracted to do in 1981-1982. Nearly a year later, on September 30, 1983, the trial court heard the petition, including extensive evidence about the then current state of the District's finances. A judgment denying the petition was filed on November 9 and the Teachers appealed on December 12, 1983. Briefing was completed on September 12, 1984.

## II. DISCUSSION

The trial judge astutely recognized this to be a difficult case. He was right. Before rendering judgment he said, "Let the appellate court settle it." In doing so we reverse the trial court's judgment but fully sympathize with the difficulty of making sense of the apparently conflicting decisions in this area of the law.

 We begin by analyzing the facts to derive the real issue raised by this case. We conclude that question is whether a school district may reduce the salaries of its teachers unilaterally and retroactively during a contract year as a means of complying with California's constitutional debt limitation. We then briefly discuss the constitutional debt limitation and its exceptions. We find one of those exceptions applies in this case. The law imposes a specific duty to provide an education and to employ teachers to do so. It further imposes an independent duty not to reduce teacher salaries during a contract year. These legal duties mean the obligation to pay the retroactive raises is not a debt voluntarily incurred by the school district but

one "imposed by law." As such, these salary obligations are exempted from the constitutional debt limitation and may be paid out of the District's income from future years.

A. What the Compton College District Did Amounted to a Unilateral, Retroactive Reduction in Faculty Salaries During the Contract Year

On the surface it appears the Compton College District merely withheld the retroactive portion of a raise negotiated with its faculty. Indeed it did. The implication is that somehow the teachers did not have as strong a claim to this money as they do to the prospective component of their raise or to the salary level they had received the previous year. Properly analyzed, however, the retroactive raise has the same legal status as any other part of the faculty's compensation.

Collective bargaining negotiations are merely one way of arriving at a salary schedule to be offered teachers for a year's worth of teaching. Of course, when faculty members are organized in a union this generally is the only way of determining that schedule. Still the salary scale established through those negotiations has the same legal effect as one a school board might set unilaterally and offer to its tenured and untenured faculty members.

When collective bargaining is involved, the negotiations ideally are completed and the salary schedule fixed before the contract year begins. If that had happened in the instant case, the Compton College faculty would have been receiving monthly paychecks throughout 1981-1982 which were more than 8 percent higher than 1980-1981—at least until the District discovered its $400,000 "accounting error" and other revenue shortfalls. (The District also would have paid them the one-time bonus and increased fringe benefits the contract promised.)

Just because the parties were some nine months into the 1981-1982 year before they finally reached agreement on the contract terms does not alter the District's obligation to pay the full annual salaries called for in the schedule based on the contract it eventually signed. The retroactive payments are merely a part of those full annual salaries. ■ California courts have specifically ruled retroactive raises of this nature do not represent unearned payments for past services. Rather they are considered a part of the compensation earned as the services were rendered. (*San Joaquin County Employees' Assn., Inc.* v. *County of San Joaquin* (1974) 39 Cal.App.3d 83 [113 Cal.Rptr. 912] and *Goleta Educators Assn.* v. *Dall'Armi* (1977) 68 Cal.App.3d 830 [137 Cal.Rptr. 324]. Both of these Court of Appeal deci-

sions were expressly approved and relied on in *Jarvis* v. *Cory* (1980) 28 Cal.3d 562, 570-72 [170 Cal.Rptr. 11, 620 P.2d 598].)

 What the District did in this case is nothing less than a retroactive reduction in the annual salary schedule the District had set for its teachers for the 1981-1982 academic year. In practical effect, it is as if the District had refused to give its teachers their last month's salary checks or had deducted about 8 percent from each month's check throughout the year. Accordingly, if the Compton College faculty members would have been entitled to compel distribution of their final month's paychecks they are entitled to recoup their retroactive raise checks.

### B. The Constitutional Debt Limitation and Its Exceptions

The District does not deny it violated its contract with the Compton College faculty by refusing to make the retroactive salary payments. Nor do the other respondents claim the District could excuse its refusal on this grounds. Instead all the respondents rely on article XVI, section 18 of the California Constitution which reads: "No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose, . . . ." (Cal. Const., art. XVI, § 18.)

This section—formerly article XI, section 18—has been part of the California Constitution since 1879. After reviewing the debates at the constitutional convention, the Supreme Court concluded this provision was aimed at "the practice prevalent both in California and in the eastern states, a practice that has grown rapidly of late years, of extravagance and expenditure in engaging in improvements of various kinds which has resulted in an enormous increase of municipal indebtedness." (*City of Long Beach* v. *Lisenby* (1919) 180 Cal. 52, 56 [179 P. 198].)

Thus the original evil the predecessor of article XVI, section 18 sought to address had to do with local government bodies which made extravagant capital investments creating huge long term debts. Had the California courts limited the provision to this central problem the instant case would not be before this court. However, early on they construed it to bar short term overexpenditures as well.

As early as 1882, the Supreme Court ruled the constitutional debt limitation barred a gas company from collecting on a contract for delivering gas

to the City of San Francisco because the city had exhausted its finances for that year. (*San Francisco Gas Co.* v. *Brickwedel* (1882) 62 Cal. 641.) This principle was followed to deny payment of contracts to boss a chain gang, (*Shaw* v. *Statler* (1887) 74 Cal. 258 [15 P. 833]), and for the sale of merchandise (*Schwartz* v. *Wilson* (1888) 75 Cal. 502 [17 P. 449]).

In 1895, the Supreme Court held a judgment for merchandise sold to a city government was uncollectible because there was a deficiency in the general fund for the year when the city purchased the merchandise. (*Smith* v. *Broderick* (1895) 107 Cal. 644 [40 P. 1033].) Moreover, the court held the judgment creditor could not look to tax revenues from later years. (107 Cal. at pp. 654-655.) Similarly, in 1896 the Supreme Court rejected the claim of a plumbing contractor who had supplied services to the municipality of San Francisco the previous year. Unfortunately for him, the city had underestimated certain other costs for that year. Thus the municipal coffers were bare by the time his bill arrived. The court held the city could not pay him for the services rendered in that year out of revenues received in later years. In doing so, it issued a stern warning to those who venture to contract with local governments: "Whoever deals with a municipality does so with notice of the limitation of its powers, and with notice also that he can receive compensation for his labor or materials only from the revenues and income previously provided for the fiscal year during which his labor and materials are furnished; . . . Even though at the time of making his contract there are funds in the treasury sufficient to meet the amount of his claim, he is charged with notice that these funds are liable to be paid out for municipal expenditures before his contract can mature into a claim against the city, . . ." (*Weaver* v. *San Francisco* (1896) 111 Cal. 319, 325-326 [43 P. 972].)

Or as the court put it even more succinctly in *McBean* v. *City of Fresno* (1896) 112 Cal. 159, 165 [44 P. 358], "If there are not revenues for any given year sufficient and available for the payment of his claims for that year, those claims become waste paper, . . ." To the same effect, see, e.g., *Bradford* v. *San Francisco* (1896) 112 Cal. 537 [44 P. 912] [city enjoined from incurring debt after it ran out of money two months before end of fiscal year and also enjoined from levying high taxes the next year to make up the deficit]; *Montague* v. *English* (1897) 119 Cal. 225 [51 P. 327] [contract for water pipe enforceable only out of revenues for year when obligation matured even though there had been sufficient public moneys available at the time the contract was signed and the pipe delivered]; *Higgins* v. *San Diego Water Co.* (1897) 118 Cal. 524 [50 P. 670], overruled *Miller* v. *McKinnon* (1942) 20 Cal.2d 83 [124 P.2d 34, 140 A.L.R. 570], [water company entitled to judgment without direction as to source of revenue for services rendered in year where city had exhausted funds but judgment only

collectible if voters subsequently approved payment from future year's revenues].

It is this harsh medicine from the 19th century which respondents seek to feed the Compton College faculty. However, the 19th century also witnessed the birth of an exception to the constitutional debt limitation. In 1893, the City of San Francisco ran out of money before it had paid the final month's salary of the chief clerk in the office of the registrar of voters. The city refused to pay this salary out of the next year's revenues for fear it would violate the constitutional debt limitation. The Supreme Court ruled this limitation did not bar this payment even though it would not come from revenues of the year when the salary was earned. The court's rationale created an exception the Compton College faculty seeks to invoke. "The clear intent expressed in the [constitutional debt limitation] was to limit and restrict the power of the municipality as to any indebtedness or liability which it has discretion to incur or not to incur. But the stated salary of a public officer fixed by statute is a matter over which the municipality has no control, and with respect to which it has no discretion; and the payment of his salary is a liability established by the legislature at the date of the creation of the office. It, therefore, is not an indebtedness or liability incurred by the municipality within the meaning of . . . the constitution.

"᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫ ᛫

"'Salaries are not liabilities against the treasury which rest upon any authorization or contract by the board of supervisors, or any other officer. They are fixed by law, and are not subject to the control of such officers. They are payable out of the general fund, and are not limited to any particular part of that fund which the board may choose to set apart for their payment.' [Quoting with approval from *Welch* v. *Strother* (1887) 74 Cal. 413.]

"Our conclusion is that the payment of the salary of a public officer whose office has been created and salary fixed by law, either statutory or constitutional, is not within the provision of [predecessor of art. XVI, § 18] of the constitution; that his salary is to be paid out of said general fund when there is sufficient money therein without regard to revenues of separate years; and that it was a duty specially enjoined by law upon respondent to pay the said audited demand of petitioner when it was presented on said third day of July." (*Lewis* v. *Widber* (1893) 99 Cal. 412, 413, 415 [33 P. 1128].)

The language of *Lewis* v. *Widber* suggests this exception only applies when both the existence of an obligation and its precise amount are imposed

on the municipality by state law. However, over the years the exception has broadened well beyond the words of this seminal opinion.[2]

In *County of Los Angeles* v. *Byram* (1951) 36 Cal.2d 694 [227 P.2d 4], the Supreme Court held the cost of constructing a courthouse was not subject to the constitutional debt limit because the county had a legal duty to provide "adequate quarters" for the courts. This legal duty was enough to avoid the debt limitation even though the county had a great deal of discretion in deciding what kind of courthouse to supply and how much to invest in it. "Since a specific mandatory obligation has been imposed on the county by the Legislature to provide suitable quarters for the courts in that county, the present facilities are not adequate, and the board of supervisors has determined that the proposed construction is necessary, we have an express law-imposed obligation on the county which is not general, . . . and the debts incurred in the performance of that duty are not within the debt limitation." (36 Cal.2d at p. 700.) In a similar decision, the Court of Appeal also exempted the cost of building police and fire stations from the constitutional debt limitation. (*City of LaHabra* v. *Pellerin* (1963) 216 Cal.App.2d 99 [30 Cal.Rptr. 752].) Once again state law only created the duty to construct something to house police and fire services. The nature and cost of these buildings were issues within the discretion of local government. Nonetheless, this was enough of a legal duty to satisfy the "imposed by law" exception to the constitutional debt limitation.

California courts have drawn a line, however, between "general" legal duties and "specific" legal duties. It is not enough the Legislature enacts a law imposing a "general" duty on local government to perform some function. ██ Only if the law imposes a "specific" duty to expend its money on that function will those expenditures be exempt from the constitutional debt limitation. (See, e.g., *Pacific Undertakers* v. *Widber* (1896) 113 Cal. 201 [45 P. 273]; *Arthur* v. *City of Petaluma* (1917) 175 Cal. 216 [165 P. 698].)

The problem is defining what counts as a "specific" legal duty as opposed to only a "general" one. We have already seen that the statute requiring "adequate quarters" for the courts was deemed sufficiently specific to avoid

---

[2]One Court of Appeal opinion also construed *Lewis* v. *Widber* to limit this exception to public officers as opposed to employees. *Martin* v. *Fisher* (1930) 108 Cal.App. 34 [291 P. 276], disapproved *Gassman* v. *Governing Board* (1976) 18 Cal.3d 137 [133 Cal.Rptr. 1, 554 P.2d 321]. Later authority is to the contrary. *Lotts* v. *Board of Park Commrs.* (1936) 13 Cal.App.2d 625 [57 P.2d 215] [holding the constitutional debt limitation does not apply to back pay awards to salaried employees even though they were not public officers]. So is the logic of the "imposed by law" exception as applied to types of relationships—contractual and otherwise—which are similar to that of employer-employee. See pages 91, 93-94, *post*.

the constitutional debt limitation. So was the duty to have a chief clerk in the registrar of voters office. In contrast, the statutory duty to bury indigents was found to be too "general" to justify an exemption for a private undertaker who contracted to provide that service for the city.

A printer fared no better in *Arthur* v. *Petaluma, supra,* in seeking to recover the cost of publishing a city charter. The Supreme Court acknowledged state law required publication of a city charter if a city wanted to move to that status. However, the initial decision to become a charter city was discretionary with the local government. Hence state law did not impose a specific duty to spend municipal funds for the publication the unlucky printer performed.

*Pacific Undertakers* and *City of Petaluma* underscored that the duty imposed on local government must be truly mandatory. In *Pacific Undertakers* the state required some provision be made for burying deceased indigents. However, it did not insist that localities contract with private undertakers rather than using their own employees to carry out this duty. And in *City of Petaluma* the state only told local governments what they had to do if they wanted to become charter cities. The state did not require every city to seek this status. Hence in both instances the court found the expenditures were discretionary acts of local government bodies not expenditures mandated by the state.

C. ██ California Law Imposes a Specific Duty on the Compton College District to Employ Teachers and Not to Reduce Their Compensation During the Contract Year

The duty begins with the California Constitution which makes education one of the highest priorities of state and local government. (Cal. Const., art. IX, §§ 1, 5; art. XVI, § 8; *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 763-67 [135 Cal.Rptr. 345, 557 P.2d 929], cert. den. *Clowes* v. *Serrano* (1977) 432 U.S. 907 [53 L.Ed.2d 1079, 97 S.Ct. 2951].) Education Code section 72290 requires each district to employ and assign instructors and other personnel. Nor is a district free to hire anyone it wants as instructors. Sections 87211, 87274-87277 and 87289-87290 describe the qualifications and certification required of persons a District employs to educate its students. Government Code section 3543.2 makes the duty still more specific. It requires community college districts to set salary schedules after engaging in good faith bargaining about "wages, hours of employment, and other terms and conditions of employment." (*San Mateo City School Dist.* v. *Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 856 [191 Cal.Rptr. 800, 663 P.2d 523].)

Thus, the Compton College District had a specific duty to employ the teachers needed to provide education to its citizens and to pay them according to a set salary schedule. This is not a case, like *City of Petaluma,* where the District had a choice whether to engage in the activity which triggered the state-mandated expenditure. Here the District had a statutory duty to provide education and to employ those needed to carry out that function. Nor is this case like *Pacific Undertakers,* where the state-mandated function could be provided in a number of ways by different sorts of personnel. Here the District is required to hire its own employees to provide the instruction—rather than perhaps contracting with private firms to do so. Moreover, the function of teaching can only be done by teachers who meet certain state-mandated qualifications as opposed to what was involved in *Pacific Undertakers*—a grave-digging task which could be accomplished by anyone capable of wielding a pick and shovel.

Respondents argue the District had no specific duty to arrive at any particular salary schedule during collective bargaining negotiations. This was a matter within the District's discretion. Accordingly, respondents contend, whatever salary levels the District agreed to constitute a liability created by the District during 1981-1982 and are subject to the constitutional debt limitation.

However, this argument assumes the law must not only impose a duty to incur an expenditure but must also set the exact amount of that expenditure. Although this construction finds some support in certain language in *Lewis* v. *Widber, supra,* 99 Cal. 412, subsequent cases have removed this restriction on the "imposed by law" exception to the constitutional debt limit. (See cases discussed at p. 91, *ante.*)

A decade ago, this modern view of the "imposed by law" exception was applied to a situation quite analogous to the instant case—*Wright* v. *Compton Unified Sch. Dist.* (1975) 46 Cal.App.3d 177 [120 Cal.Rptr. 115]. In that case, the school district employed a private lawyer to represent several district officials and employees who were charged with defamation. State law imposes a duty to provide legal representation in this circumstance at district expense. However, it does not require the district to pay the attorney a specific total fee or to limit the attorney to a certain hourly rate. Indeed it gives the district discretion to use a salaried public lawyer rather than a private attorney. Nonetheless, the court ordered the district to pay the lawyer his fees even though it had already exhausted its revenues for the years he had billed.

The Court of Appeal ruled the constitutional debt limitation was no bar to recovery. "[T]his . . . limitation does not apply to an obligation or lia-

bility imposed by law as distinguished from one voluntarily incurred. [Citations omitted.]

" . . . . . . . . . . . . . . . . . . . . . . .

"Government Code section 995 expressly imposes upon a public entity . . . the specific duty to provide a defense for its employees to civil actions brought against them which arise out of acts performed in the scope of their employment. In the instant case, the fulfillment of such duty . . . took the form of a contract between the district and plaintiff. The obligation represented by the contract, being one imposed upon the district by law, was not subject to the debt limitation . . . . This conclusion is strengthened by the fact that . . . [the district] in employing plaintiff to defend its employees, discharged its duty in a manner expressly provided by law. [That is, by employing a private lawyer as authorized but not mandated under Gov. Code, § 996.]

" . . . . . . . . . . . . . . . . . . . . . . .

"The result is that . . . . a school district is liable for obligations imposed by law even though they exceed in any year the money available to the district in that year." (*Wright* v. *Compton Unified Sch. Dist., supra,* 46 Cal.App.3d at pp. 181, 183, 184. Sentence in brackets added for clarification.)

In *Wright,* as in the instant case, the law imposed a duty to perform a certain function. In *Wright* it was to provide a legal defense; here it is to provide a post secondary education. And in *Wright,* as in the instant case, the law imposed a duty to employ members of a certain occupation to perform that function—in *Wright,* lawyers, in this case, teachers. But in both *Wright* and our case the school district had discretion to negotiate whatever compensation levels it wanted to with the individuals hired to discharge the mandated function. Yet the *Wright* court found the state had imposed a sufficiently specific duty to exempt the agreed-upon compensation from the constitutional debt limitation. ▮ We likewise conclude the duties imposed on the Compton College District justify exempting teacher salaries from that same constitutional provision.

There is a second and independent reason the District had a legal duty to pay the full amount of the salaries it negotiated with its teachers—including the retroactive raise portions of those salaries—for 1981-1982. This follows because the law imposes a specific duty on local districts to maintain faculty salaries at the level set by contract for the full contract year. Thus, even if

there was no legal obligation to provide an education or to employ teachers or to negotiate with them about salary, the District nonetheless did have a duty not to reduce any teacher salaries it might have voluntarily contracted to pay. As the Supreme Court observed 50 years ago: " 'The Legislature in this state designed to give to teachers . . . a permanency of tenure, but this has . . . been held to carry with it no assurance against change in salary. . . . The power of the trustees to raise or reduce the salaries of permanent teachers cannot be doubted, *provided . . . no attempt is made* after the beginning of any particular school year *to reduce the salaries for that year.*' " (*Abraham* v. *Sims* (1935) 2 Cal.2d 698, 711 [42 P.2d 1029], italics added. See also *City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898, 930 [120 Cal.Rptr. 707, 534 P.2d 403]; *A.B.C. Federation of Teachers* v. *A.B.C. Unified School District* (1977) 75 Cal.App.3d 332, 337-338 [142 Cal.Rptr. 111]. See also Education Code section 87743 which does not allow teachers to be terminated for lack of attendance—and attendant shortage of revenues—until the *close* of the school year.)

It makes no difference how the board arrives at the salary levels for the year—whether by negotiations with a union or by contracting with individual teachers on a case by case basis or by establishing a standard salary schedule. Once the amount is set, it cannot be reduced *during that year.* In the instant case, the salaries were set on the basis of collective bargaining negotiations. But that does not lessen the duty to pay the full salary agreed upon for the year. True, the board is free to negotiate a lower salary for the next bargaining period. But this does not mean it can reduce the 1981-1982 salary below the levels agreed upon during the negotiations for that year.[3]

D. The Constitutional Debt Limitation Does Not Bar the Payments Required to Restore the Illegal Retroactive Reductions in Faculty Salaries for the 1981-1982 Fiscal Year

The Compton College District Board did not have the discretion to reduce the salaries of its faculty for 1981-1982 once the salary schedule was set in March 1982. It nevertheless attempted to do so by withholding the retro-

---

[3]The District cites Education Code section 72500 as a further debt limitation on boards of education. This section provides in pertinent part that "[t]he governing board of any community college district is liable . . . for all debts and contracts, including the salary due any instructor not made in excess of the moneys accruing to the District and usable for the purposes of the debts and contracts during the school year for which the debts and contracts are made." However, in *Wright* v. *Compton Unified Sch. Dist., supra,* 46 Cal.App.3d 177, 183-184, the court held this statutory provision merely restates the constitutional debt limitation and is not an independent limitation on school board spending. "The result is that, under both the Constitution and the statute, a school district is liable for obligations imposed by law even though they exceed in any year the money available to the district in that year." (46 Cal.App.3d at p. 184.)

active portion of the raise component of the 1981-1982 schedule. The payments required to restore these salary reductions do not represent obligations the local district voluntarily incurred. Rather they are expenditures state law requires it to make. Consequently, these expenditures are not barred by the constitutional debt limitation and can be made out of revenues and income from later fiscal years.

In many respects this case resembles *Lotts* v. *Board of Park Commrs.* (1936) 13 Cal.App.2d 625 [57 P.2d 215]. There a local board attempted to convert several full-time employees to part-time status. The court ruled this action improper. The board next contended the constitutional debt limitation nevertheless precluded it from repaying these employees for the difference between part-time and full-time pay during the years the illegal reclassification was in effect. But the court rejected that argument also in language very relevant to this case. "It has been repeatedly held by the courts of this state that [the constitutional debt limitation] refers only to an indebtedness or liability which one of the municipal bodies . . . has itself incurred . . . . [Citation omitted.] The clear intent expressed in the constitutional clause was to limit and restrict the power of the municipality as to any indebtedness or liability which it has discretion to incur or not to incur, and in our opinion the *salary due an employee is* an obligation of the city *not responsive to [the constitutional debt limitation]*." (Italics added.) (13 Cal.App.2d at p. 635.)

The *Lotts* opinion appears to hold all public employee salaries are exempt from the constitutional debt limitation. However, we need not go that far to sustain the payments to Compton College faculty members. In *Lotts* the local government had wrongfully reduced its employees' salaries by forcing them to accept part-time status. Here the District wrongfully reduced its faculty salaries by simply withholding a portion of their annual salaries. In both situations the law creates a duty to restore the illegal cuts. Thus, in both situations repayment is not an obligation voluntarily assumed by local government; it is a duty imposed by law. As such, the repayments are not subject to the constitutional debt limitation either in *Lotts* or in the instant case.[4]

---

[4]Two Court of Appeal opinions decided before *Lotts* appear to take a different view. (*Martin* v. *Fisher, supra,* 108 Cal.App.34, 41; *Briney* v. *Santa Ana High School Dist.* (1933) 131 Cal.App. 357, 363-364 [21 P.2d 610], disapproved in *Gassman* v. *Governing Board, supra,* 18 Cal.3d 137.) Both involved suits for backpay by teachers who allegedly had been wrongfully discharged and thus had not actually taught during the years for which funds were exhausted. In each case, the teacher was reinstated. But in each the court refused to order backpay in the absence of a showing the district had unexpended funds remaining for the years the teacher was wrongfully prevented from teaching. The *Martin* court (*Briney*

## E. The Appellant Is Not Entitled to Attorney's Fees

■ Appellant union asks for an award of attorney fees under section 1021.5 of the Code of Civil Procedure. This section authorizes a court to compel one or more opposing parties to pay attorney fees to a "successful party" when certain criteria are met. First, it must be an "action which has resulted in the enforcement of an important right affecting the public interest. . . ." Secondly, "a significant benefit, whether pecuniary or nonpecuniary," must have "been conferred on the general public or a large class of persons, . . ." Thirdly, "the necessity and financial burden of private enforcement" must be "such as to make the award appropriate, . . ." And fourth, "such fees should not in the interest of justice be paid out of the recovery, if any." (Code Civ. Proc., § 1021.5.)

Appellant union urges this case enforces an important right affecting the public interest since it resolves "a question of first impression, namely, the applicability of the constitutional debt limitation to collective bargaining negotiations in California school districts." We agree the first of the four criteria is met. Appellant union then cites *Wilkerson* v. *City of Placentia* (1981) 118 Cal.App.3d 435 [173 Cal.Rptr. 294] to support a conclusion the remaining criteria also are satisfied. In that case, the court awarded fees to the plaintiff, an individual probationary fireman, who succeeded in a claim

---

merely quoted and relied on the *Martin* rationale) reasoned the school board would have been entitled to dismiss the plaintiff during the year it was short of funds on grounds it did not have the money to pay her, even if it could not dismiss her for the reason it did. Consequently, the teacher had no claim to backpay for that year. In the instant case, in contrast, the teachers involved were not dismissed for shortage of funds or any other reason. Indeed they actually performed the services for which they seek the full pay they were promised for those services. So this case is easily distinguishable from *Martin* and *Briney*.

Indeed the *Lotts* court found it unnecessary to even mention to say nothing of distinguishing *Martin* and *Briney* when confronted with a situation comparable to the instant case. In *Lotts*—as in the case before us—the employees actually had worked during the fiscal period for which the local agency claimed it no longer had funds. Different from our case, the employees in *Lotts* had been involuntarily reduced from full-time to part-time employees and others hired to perform the work the plaintiffs had formerly done. Thus, the *Lotts* court did not have before it the problem addressed in *Martin* and *Briney*. Even less so is this issue before our court. Here the employees personally performed *all* the services for which they seek backpay as opposed to *Lotts* where the workers received backpay for duties they wanted to perform but which actually were handled by others who already had received compensation for doing so.

Moreover, the Supreme Court has cast further doubt on the continued viability of *Martin* and *Briney* in its decision in *Gassman* v. *Governing Board, supra,* 18 Cal.3d 137. In that case, the Supreme Court expressly disapproved both of these decisions insofar as they purported to hold teachers can be dismissed under Education Code section 13443, subdivision (d) on grounds the school district will be short of funds for the coming year. (18 Cal.3d at pp. 146-148.)

for backpay. His case established a legal principle which extended legal protections to a "large class of persons," i.e., similarly situated probationary public employees. We agree with appellant the instant case confers a benefit on a large class of people—a substantial category of public employees—just as did *Wilkerson*. Thus the second of the four criteria also is satisfied.

On the other hand, when we turn to the third of the criteria *Wilkerson* is easily distinguishable. Indeed it exemplifies a situation where "the necessity and financial burden of private enforcement are such as to make the award appropriate" while the instant case is not. We might be disposed to consider awarding counsel fees were appellant an individual like Mr. Wilkerson or a legal services organization as was involved in *Folsom* v. *Butte County Assn. of Governments* (1982) 32 Cal.3d 668 [186 Cal.Rptr. 589, 652 P.2d 437], or a neighborhood association (*Friends of "B" St.* v. *City of Hayward* (1980) 106 Cal.App.3d 988 [165 Cal.Rptr. 514]), or the like. But in this case the appellant is a union. One of the functions of unions is to provide legal counsel to enforce the terms of contracts they sign on behalf of their members. This essentially is what was involved in the instant case. The subject of the litigation was enforcement of the salary clauses in the union's contract. The primary beneficiaries of the litigation—including the appeal— are the members of the appellant union.

Appellant made no showing the legal costs were extraordinarily large or the union so small it lacked the funds to protect its members' interests in the courts. Furthermore, on its face it does not appear the benefits to non-litigants are so out of proportion to the benefits received by the membership of appellant's union as to justify an attorney fee award as a means of encouraging similar lawsuits in the public interest. Nor is there evidence in the record at this time demonstrating this to be a situation where the legal costs are so high and the litigant's benefits so modest there will be no net recovery—or a very small one—unless the other party is compelled to pick up the winner's attorney fees. Accordingly, under the circumstances of this case we are not in a position to make a finding "the necessity and financial burden of private enforcement are such as to make the award appropriate." Nor can we on the present record make the required finding "such fees should not in the interest of justice be paid out of the recovery, if any." Accordingly, we must remand these issues to the trial court for a determination whether appellant union is entitled to attorney fees and if so, how much. (*Lucchesi* v. *City of San Jose* (1980) 104 Cal.App.3d 323 [163 Cal.Rptr. 700]; cf., *Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917 [154 Cal.Rptr. 503, 593 P.2d 200].)

## Disposition

The judgment denying the petition for writ of mandate is reversed and the cause remanded for further proceedings consistent with this opinion.

Lillie, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied March 26, 1985, and respondents' petitions for review by the Supreme Court were denied June 20, 1985. Kaus, J., was of the opinion that the petitions should be granted.