Filed 4/25/25; Certified for publication 5/20/25 (order attached)
Opinion following rehearing

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| MOVING OXNARD FORWARD, INC., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF OXNARD et al., <br><br> Defendants and Respondents; <br><br> OXNARD COMMUNITY DEVELOPMENT COMMISSION SUCCESSOR AGENCY et al., <br><br> Real Parties in Interest. | 2d Civ. Nos. B334636, B335866 <br> (Super. Ct. No. 56-2022-00573015-CU-JR-VTA) <br> (Ventura County) |

The City of Oxnard (the City) and two other public agencies entered into a joint powers agreement to create the City of Oxnard Financing Authority (Financing Authority) (collectively

Respondents).  The City and Financing Authority later approved two lease revenue bonds to finance public capital improvements. Appellants Moving Oxnard Forward, Inc. and Aaron Starr (collectively Appellants)[1] brought a reverse validation action (Code Civ. Proc., § 860 et seq.) to challenge the approval of these bonds.  Among other things, they contend the bonds violate constitutional debt limits imposed by article XVI, section 18 of the California Constitution.  The trial court ruled in favor of Respondents.  Appellants appeal from the judgment.  We affirm.

FACTS AND PROCEDURAL HISTORY

The Joint Exercise of Powers Act (Gov. Code,[2] § 6500 et seq.) (the Act) "provides a means by which governmental agencies may join together to accomplish goals that they could not accomplish alone, or that they might more efficiently and more effectively accomplish together."  (*Robings v. Santa Monica Mountains Conservancy* (2010) 188 Cal.App.4th 952, 962.)  Under the Act, two or more public entities may enter into a joint powers agreement to create a joint powers authority, which is a separate entity vested with the power to exercise powers common to the contracting parties and also those conferred by state law. (§§ 6502, 6503.5, 6507-6508; 6547; (*Rider v. City of San Diego* (1998) 18 Cal.4th 1035, 1050-1054 (*Rider*).)

In 1991, the City, the Oxnard Community Development Commission (as successor to the Redevelopment Agency of the

---

[1] Moving Oxnard Forward is a nonprofit organization representing citizens of Oxnard, and Starr is a resident of Oxnard.

[2] Further unspecified statutory references are to the Government Code.

City of Oxnard), and the Housing Authority of the City of Oxnard entered into a joint powers agreement to create the Financing Authority pursuant to the Act (§ 6500 et seq.).  The Financing Authority was created "to finance the cost of any capital improvement, working capital, or liability and other insurance needs, or projects wherever there are significant public benefits, as determined by the City."  As a joint powers authority, the Financing Authority can issue revenue bonds to finance public capital improvements.  (§§ 6546, 6547, 6584-6599.3.)

In 2022, the City held a noticed public hearing regarding the approval of the Financing Authority's issuance of two lease revenue bonds: the City of Oxnard Public Financing Authority Lease Revenue Bonds, Series 2022A and 2022B.  The bonds would finance street improvements within the city and software upgrades to the City's enterprise resource planning system (business management software system).

The 2022A and 2022B Bond Series financing was based on a lease-leaseback arrangement.  The City would lease certain properties to the Financing Authority for a nominal amount.  The Financing Authority, in turn, would sublease the properties back to the City in exchange for payments to cover the annual debt on the bonds (debt service), and additional payments, including insurance, taxes, and other administrative expenses.

Appellants attended the public hearing and opposed the approval of the bonds.  The City adopted Resolution No. 56 and the Financing Authority adopted Resolution No. 15,638 (collectively the Resolutions).  The Resolutions approved and authorized the Financing Authority's issuance of the Bond Series 2022A and 2022B, not to exceed $36,000,000 and $9,000,000, respectively.

Appellants filed a complaint and petition for a writ of mandate/administrative mandamus seeking to invalidate the Resolutions. They argued the bonds violated constitutional debt limits under article XVI, section 18 of the California Constitution because the City failed to obtain a two-thirds vote of the electorate. They also argued the City failed to comply with the procedural requirements of the Act.

Following a hearing in December 2023, the trial court issued a tentative statement of decision finding in favor of Respondents on the reverse validation cause of action.[3] Because it found the *Offner-Dean*[4] rule applied to the lease revenue bonds, the court concluded the City was not required to seek voter approval before authorizing them. The court also found Respondents complied with the Act in authorizing the bonds under the Resolutions. The court adopted its tentative decision and entered judgment in favor of Respondents.[5]

---

[3] The trial court dismissed the other two causes of action for writ of mandate/administrative mandamus and declaratory relief. It dismissed the former because appellants had "an adequate legal remedy in the form of a reverse validation action." It dismissed the latter because its "gist and effect" was the same as the reverse validation cause of action.

[4] *City of Los Angeles v. Offner* (1942) 19 Cal.2d 483 (*Offner*) and *Dean v. Kuchel* (1950) 35 Cal.2d 444 (*Dean*).

[5] Appellants appealed the tentative decision in case number B334636, and later appealed the judgment in case number B335866. The two cases were consolidated.

DISCUSSION

*Relevant law*

*1. Constitutional debt limit*

Article XVI, section 18 of the California Constitution provides that no "county, city, town, township, board of education, or school district shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters."  In other words, "each year's income and revenue must pay each year's indebtedness and liability, and . . . no indebtedness or liability incurred in any one year shall be paid out of the income or revenue of any future year." (*San Francisco Gas Co. v. Brickwedel* (1882) 62 Cal. 641, 642.)  The purpose of the constitutional debt limit is to curtail local government entities from making extravagant capital investments that result in large, long-term debt.  (*Compton Community College etc. Teachers v. Compton Community College Dist.* (1985) 165 Cal.App.3d 82, 88; *Taxpayers for Improving Public Safety v. Schwarzenegger* (2009) 172 Cal.App.4th 749, 761.)

2.  Offner-Dean *rule and* Rider

There are several exceptions to the constitutional debt limit.  One exception is "when a local government enters into a contingent obligation." (*Rider, supra*, 18 Cal.4th at p. 1047.)  " 'A sum payable upon a contingency is not a debt, nor does it become a debt until the contingency happens.' [Citation.]  This contingency exception has been applied to uphold multiyear contracts, such as leases, where the governmental entity agrees to pay sums in succeeding periods in exchange for property, goods, or services to be provided during those periods.  [Citation.]

5

Each periodic payment is viewed as a contemporaneous payment for the property, goods, or services received rather than an installment payment on a long-term debt." (*Taxpayers for Improving Public Safety v. Schwarzenegger, supra*, 172 Cal.App.4th at pp. 762-763.)  These types of multiyear contracts "allow local governments to avoid price volatility from year to year and to negotiate lower prices overall by making long-term commitments." (*Rider*, at p. 1047.)

Based on *Offner* and *Dean*, our Supreme Court developed the *Offner-Dean* rule and applied the contingency exception to long-term lease arrangements for financing public capital improvements.  In *Offner, supra*, 19 Cal.2d at pp. 484-485, the City of Los Angeles proposed an agreement where it would lease real property to a private contractor for 10 years for $1 a month and the contractor would construct an incinerator on the property and lease the property back to the city at a monthly amount to be determined by competitive bid.  The agreement further provided the city with an option to purchase the incinerator at various intervals during the lease at its then-appraised value.  If the city did not purchase the incinerator, the contractor would have an opportunity to remove it from the land when the lease term expired.

*Offner* upheld the lease agreement, reasoning that "if the lease . . . is entered into in good faith and creates no immediate indebtedness for the aggregate installments therein provided for but, on the contrary, confines liability to each installment as it falls due and each year's payment is for the consideration actually furnished that year," there is no constitutional debt limit violation. (*Offner, supra*, 19 Cal.2d at p. 486.)  But if the agreement creates "a full and complete liability upon its

6

execution, or if its designation as a 'lease' is a subterfuge and it is actually a conditional sales contract in which the 'rentals' are installment payments," the contract is void. (*Ibid.*) In upholding the lease, our Supreme Court stressed that there was no immediate indebtedness for the aggregate installments, each year's installment was in exchange for the consideration actually furnished that year (use of the land and incinerator), and the city was not required to exercise the option to purchase the incinerator. (*Id.* at pp. 486-487.)

In *Dean*, *supra*, 35 Cal.2d 444, the court applied the contingency exception to a ground lease agreement providing that the state lease real property to a private company for 35 years for $1. (*Id.* at p. 445.) The company agreed to build an office building and lease the land back to the state for 25 years for monthly rent in exchange for the state's use and occupancy of the office building. At the end of the 25-year building lease, the 35-year ground lease expired, and the title in the land and the building would vest to the state with no additional payment. (*Id.* at p. 446.) Our Supreme Court upheld this lease agreement, concluding that, as in *Offner*, the monthly rental payments were in exchange for contemporaneously received consideration—i.e., use of the building. It made no difference that the title to the land and the office building vested to the state at the end of the lease terms. (*Dean*, at p. 448.)

In *Rider*, *supra*, 18 Cal.4th 1035, the court revisited the *Offner-Dean* rule. There, the City of San Diego operated a convention center owned by the San Diego Unified Port District. The city and port district entered into a memorandum of understanding in which they agreed to expand the convention center. To implement the plan, they entered into a joint powers

7

agreement to create the financing authority. The port district agreed to lease the center and the site to the financing authority for $2; the financing authority was to issue lease revenue bonds to finance the expansion; the financing authority agreed to sublease the convention center and the expansion to the city; the city agreed to pay rent equal to the debt service on the bonds, including interest and principal, and additional rent to cover the administration expenses; and the port district agreed to pay the city $4.5 million each year for 20 years to help the city meet its obligations to the financing authority. When all the payments were made on the bonds, the financing authority agreed that title to the expansion would vest to the port district, the various leases would expire, and the financing authority would dissolve. (*Rider*, at pp. 1039-1040.)

*Rider* concluded that the California Constitution permitted the City of San Diego to create a joint powers authority (i.e., the financing authority) to finance the public works project without a two-thirds vote. (*Rider*, *supra*, 18 Cal.4th at p. 1042.) The court rejected the argument that the financing authority was merely a "shell" that was for "all practical purposes . . . the City." (*Ibid.*) The court explained that the Constitution permits the city "to avoid the two-thirds vote requirement by creating a joint powers agency to finance public works projects." (*Ibid.*) Furthermore, the "Constitution does not include joint powers agencies in this list of public entities that cannot incur indebtedness without a two-thirds vote." (*Id.* at p. 1043.) Joint powers agencies exist as separate entities from the city. (*Id.* at p. 1044; §§ 6503.5, 6507.)

*Rider* also upheld the lease agreement and rejected the argument that the city's rental payments violated the constitutional debt limit. (*Rider*, *supra*, 18 Cal.4th at p. 1045.)

8

As in *Offner* and *Dean*, the city entered into a contingent obligation, where the sum payable upon a contingency was not a debt. (*Rider*, at p. 1047.) The rent payments were "exchanged for contemporaneously received consideration. Specifically, the lease expressly provides that each rent payment will be made 'in consideration of the right of the use and possession of, and the continued quiet use and enjoyment of, the Leased Property.' " (*Id.* at p. 1049.) And, "if the City somehow loses use of the Convention Center, its obligation to pay rent will abate." The financing authority also "waived any right to accelerated payment of rents in the event the City breaches the agreement. In sum, the City will incur no obligation to make an individual rent payment until it receives the consideration corresponding to that payment." (*Ibid.*)

### 3. Marks-Roos Act

Under articles 2 and 4 of the Act, joint power authorities have the power to issue revenue bonds without the two-thirds voting requirement. They may do so by adoption of (1) an ordinance under article 2 of the Act (§§ 6546, 6547) or (2) a resolution under article 4, the Marks-Roos Local Bond Pooling Act of 1985 (Marks-Roos Act) (§§ 6584-6599.3). (*Rider, supra,* 18 Cal.4th at pp. 1050-1051.) The Financing Authority here issued revenue bonds through resolutions pursuant to the Marks-Roos Act.

The Marks-Roos Act is intended to assist local agencies in financing public capital improvements, working capital, liability and other insurance needs, or projects whenever there are "significant public benefits" for taking that action. (§ 6586.) Significant public benefits include "[d]emonstrable savings in the effective interest rate, bond preparation, bond underwriting, or

9

bond issuance costs," "[s]ignificant reductions in effective user charges levied by a local agency," "[e]mployment benefits from undertaking the project in a timely fashion," or "[m]ore efficient delivery of local agency services to residential and commercial development." (§ 6586.) The joint powers authority may also "[i]ssue bonds . . . to pay the cost of any public capital improvement" under this act. (§ 6588, subd. (c).)

These provisions are intended to supplement rather than limit other laws allowing public agencies to finance public capital improvements. Issuing these bonds through resolutions permitted under the Marks-Roos Act "need not comply with the requirements of any other state laws applicable to the issuance of bonds, including, but not limited to, other articles under the same chapter." (§ 6587.) "The Legislature could hardly have made clearer that a joint powers agency can issue bonds under article 4 of the Act without complying with the procedural restrictions found elsewhere in state law." (*Rider*, *supra*, 18 Cal.4th at p. 1052.)

*Standard of review*

A reverse validation action is a challenge to an agency's "legislative type activity." (*Morgan v. Community Redevelopment Agency* (1991) 231 Cal.App.3d 243, 258.) Judicial review "is limited to an examination of the record before the authorized decision makers to test for sufficiency with legal requirements. [Citation.] A substantial evidence review is limited to the record before the [administrative agency or agencies]; it is an examination of the proceedings before the entities to determine if their actions were arbitrary, capricious, or entirely lacking in evidentiary support. The trial court reviews the decision-making process of the administrative agency [or agencies] and does not

conduct its own evidentiary hearing." (*Ibid.*)  "On appeal, we apply the same standard of review.  We examine the administrative record to determine whether substantial evidence supports the trial court's findings.  [Citation.]" (*Poway Royal Mobilehome Owners Assn. v. City of Poway* (2007) 149 Cal.App.4th 1460, 1479.)

*Additional payment*

Appellants contend the Resolutions authorizing the Series 2022A and 2022B bonds violate the constitutional debt limit because they require "additional payments" separate from base rental payments that are "long-term debt obligations."  We disagree.

*1.  Relevant background*

To finance the Series 2022A and 2022B revenue bonds, the City and Financing Authority utilized the 2019 Facility Lease and 2019 Site Lease (2019 leases).  The City and the Financing Authority previously entered into these leases for the issuance of prior bonds, the Lease Revenue Bonds, Series 2019A.  Pursuant to the 2019 leases, the City leased real property to the Financing Authority pursuant to the 2019 Site Lease; the Financing Authority then subleased the property back to the City under the 2019 Facility Lease; and the Series 2019 bonds were secured by rental payments and additional payments for administrative costs and other fees.  Base rental was equivalent to the debt service on the Series 2019A bond.

Under a section entitled "Rental Payments," the 2019 Facility Lease provides: "The City agrees to pay to the Authority . . . as rental for the use and occupancy of the Leased Property, the following amounts at the following times: [¶] (a) <u>Base Rental</u>. . . . the City shall pay to the Authority rental hereunder

11

as Base Rental Payments for the use and occupancy of the Leased Property for each Lease Year or portion thereof . . . . [¶] . . . [¶] (b) <u>Additional Payments.</u> The City shall also pay in addition to the Base Rental Payments, to the Authority. . . in each year as shall be required for the payment of all costs and expenses incurred in connection with the execution, performance or enforcement of this Facility Lease . . . including but not limited to all fees, costs and expenses and all administrative costs of the Authority relating to the Leased Property including, . . . salaries and wages of employees, overhead, insurance premiums, taxes and assessments (if any), expenses . . . and all other reasonable and necessary administrative costs of the Authority. . . . [¶] . . . [¶] (c) <u>Consideration.</u> [¶] (i) Such payments of Base Rental Payments for each Lease Year . . . shall constitute, together with the Additional Payments, the total amount due for such Lease Year . . . and shall be paid . . . by the City for and in consideration of the right of the use and possession of, and the continued quiet use and enjoyment of, the Leased Property."

The Resolutions at issue in this appeal approved amendments to the 2019 Facility and Site Leases to fund the Series 2022A and 2022B revenue bonds. The 2019 Facility Lease was amended to include additional real property and to increase the amount of base rental payments. Thus, the terms and provisions of the amended facility lease was to "form part of the 2019 Facility lease," and the 2019 Facility lease would "continue in full force and effect in accordance with the terms and provisions thereof, as . . . amended and supplemented." And pursuant to these terms, the City would pay the Financing Authority base rental payments (in the amount equivalent to the principal and interest on the 2022 bonds) and additional

payments, including administrative costs and insurance premiums, in exchange for use and occupation of the leased properties.

## 2. *Analysis*

In our view, the City's obligation to pay "additional payments" are not unconstitutional "long-term debt obligations." The amended facility lease defines "additional payments" as administrative costs and expenses, taxes, assessments, insurance premiums, and other such expenses associated with the leased property.  It also specifies, that the "payments of Base Rental Payments for each Lease Year . . . shall constitute, *together with the Additional Payments*" "consideration of the right of the use and possession of, and the continued quiet use and enjoyment of, the Leased Property."  (Italics added.)  Thus, the additional payments are contingent obligations that are paid (together with the base rent) in exchange for the City's use of the leased property.  And because the additional payments arise in the same fiscal year they are due and payable, the obligation to make these payments only arises when the City receives use and occupancy of the leased property for the fiscal year. (See *Offner, supra*, 19 Cal.2d at p. 486.)  The additional payments, along with the base rental payments, are also subject to abatement if there is substantial interference with the City's use and possession of the property.

Appellants nevertheless contend the additional payments are "impermissible payments obligated above-and-beyond the consideration of the lease values" received.  We are not persuaded.  Our Supreme Court in *Rider, supra*, 18 Cal.4th at pp. 1040, 1049, upheld the validity of a lease agreement which included similar additional payments as a part of the total

13

payment that served as consideration under the terms of that agreement.  There, the City of San Diego agreed to cover all of the financing authority's obligations as they arose, which included "rent equal to the debt service on the bonds, including interest and principal, *and additional rent to cover the Financing Authority's administrative expenses.*"  (*Id.* at p. 1040, italics added.)  And in *Starr v. City and County of San Francisco* (1977) 72 Cal.App.3d 164, 172 (*Starr*), the Court of Appeal recognized that additional payments for taxes and assessments, administrative costs, and insurance premiums were "not uncommon concomitants of a lease" and that "together with base rental, is recited to be 'the fair rental value of the Project.' "  We similarly conclude the additional payments at issue here are permissible.

Appellants compare this case to *Chester v. Carmichael* (1921) 187 Cal. 287, but that case is inapposite.  *Chester* involved a land conveyance to the City of Sacramento and an agreement to build and maintain a public park on the land as a condition of conveying title to the property.  Under the contract terms, the landowner would convey the land to the city with some conditions, including that the city pay a minimum of $5,000 per year for the improvement of the park.  (*Id.* at p. 289.)  Our Supreme Court concluded the contract violated constitutional debt limits because the city entered a contract for purchase of the land, and the debt was created at the time the contract was entered.  (*Id.* at p. 293.)  As the court observed, "the full liability [of the city] to the grantors was created upon the acceptance of the deed."  (*Id.* at p. 294.)  Thus, the city's obligation to pay the minimum $5,000 per year was not contingent on anything once the city accepted the deed to the property.  But here, the City's

14

obligation to pay the additional payments is contingent upon delivery of continued use and occupancy of the property.

Appellants also rely on *Starr*, *supra*, 72 Cal.App.3d 164. But *Starr* is consistent with our conclusion. In *Starr*, the Court of Appeal considered the validity of two contracts—a project lease and "repayment contract"—between the City of San Francisco and the San Francisco Redevelopment Agency. (*Id.* at p. 168.) The project lease provided for the agency to issue bonds for financing the project and construction of facilities, and the agency would lease the project to the city in exchange for base rent and "additional rental" consisting of taxes, administrative costs, and insurance. (*Id.* at p. 169.) The repayment contract called for the creation of a special fund consisting of designated tax revenues and income derived from the project. (*Id.* at pp. 169-170.) The purpose of the special fund was to repay a loan incurred by the agency to the United States Department of Housing and Urban Development (HUD) to help finance the project. (*Id.* at p. 170.) The repayment contract further provided that at a certain date, if sufficient funds had not been deposited in the special fund to meet this obligation, the city would make up the deficit from whatever source it may lawfully use. (*Ibid.*)

*Starr* upheld the project lease, concluding that the lease was "in substantial compliance with the *Offner-Dean* rule." (*Starr*, *supra*, 72 Cal.App.3d at p. 172.) But the court concluded the repayment contract was invalid because it was not supported by consideration since the contract did not designate the city's payments to the HUD as " 'rentals' " exchanged for use and occupancy of the premises. (*Id.* at p. 173.) Moreover, the repayment contract created a debt when the contract was

executed which the city would have to pay in the future out of its general funds. (*Id.* at p. 174.)

Appellants contend the additional payments here are akin to the invalid HUD payments in *Starr*. We disagree. The additional payments here are tied to the base rental payments and are consideration for the use and occupancy of the leased properties furnished in the same year. "This is the essence of the *Offner-Dean* rule." (*Starr, supra,* 72 Cal.App.3d at p. 172.) Nor do the additional payments create a future debt that the City is obligated to pay from general funds. They are like the "additional rental" required by the project lease upheld in *Starr*. (*Ibid.*)

Appellants also contend additional payments, including the City's obligation to pay "reserve funds," improperly guarantee future lease payments even if the City "loses the occupancy and use" of the leased properties. We are not persuaded.

Reserve funds are separate funds that serve as security for the debt service on the 2022 bonds, and such funds are a standard funding requirement for bond financing. They are another form of insurance. The reserve funds are initially funded during the issuance of the bonds from bond proceeds. They cover any missed lease payments and are not drawn upon unless the City misses a payment. If the City does not miss a lease payment, it does not pay into the reserve fund after the initial funding. Only if there is a missed payment and the reserve fund is drawn would the City pay into the reserve fund. And because these payments from the reserve funds are due and payable immediately, they do not extend into future fiscal years. To the extent appellants argue the City is guaranteeing payment in the event of abatement, we do not read the lease agreement to

16

obligate the City to continue paying into the reserve fund when it loses all use and occupancy of the leased properties. Rental payments due, including base rental payments and additional payments, are "subject to complete or partial abatement . . . to the extent that there is substantial interference with the City's right to use and occupy the Leased Property or any portion thereof." We conclude that additional lease or rental payments to the reserve funds are not unconstitutional noncontingent obligations because they do not guarantee future payments irrespective of the City's use of the leased property.

*Requirement for measured fair market value*

Appellants also contend the lease-leaseback funding does not comply with the *Offner-Dean* rule because the City's base rental payments, equivalent to the principal and interest payments on the bonds, is not tied "to actual or reasonably measured market rental values." Again, we are not persuaded.

*Rider*, *supra*, 18 Cal.4th 1035, upheld a similar lease agreement. In *Rider*, the City of San Diego agreed to pay rent "equal to the debt service on the bonds, including interest and principal, and additional rent to cover the Financing Authority's administrative expenses." (*Id*. at p. 1040.) The "City and the Port District . . . created a financing mechanism that matches as closely as possible (in practical effect, if not in form) a City-financed project, but avoids the two-thirds vote requirement." (*Id*. at p. 1055.) Thus, the rental value was not based on measurement of fair market value, but rather on the financing of the project.

Appellants contend *Rider*'s analysis of value was merely dicta. But even if it were dicta, a statement of the Supreme

17

Court should be considered persuasive. (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169.) We follow it here.

In our view, the lease-leaseback funding arrangement does not run afoul of the *Offner-Dean* rule. The record reflects the City's annual rent to the Financing Authority intended to represent the fair rental value of the leased properties. The City evaluated several factors, including replacement costs of the leased property, to determine the fair rental value. The City determined the fair rental value was not less than the maximum base rental payments under the facility lease. And the City agreed that increases to the base rental payments would not exceed the annual fair rental value of the leased property.

*Significant public benefits under the Marks-Roos Act*

Appellants contend the Marks-Roos Act requires a hearing "to be held in which evidence was required to be taken." They contend no evidentiary hearing was held and that no evidence supports the City's finding of a significant public benefit. We again disagree.

Nothing in section 6586.5 nor any other provision in the Marks-Roos Act requires the local agency to hold a separate evidentiary hearing to make an evidentiary finding regarding a significant public benefit in order to finance public capital improvements.

Section 6586.5 provides several conditions to issue a bond for public capital improvements. The relevant condition here is that the local agency "has approved the financing of the public capital improvement and made a finding of significant public benefit in accordance with the criteria specified in Section 6586 after a public hearing held by that local agency." (§ 6586.5, subd. (a)(2).) This condition was met. After a public hearing and

18

"based on information provided to [it]" by staff and financial consultants, the City found that the issuance of the 2022 bonds would yield "demonstrable savings in bond preparation, bond underwriting and bond issuance costs, and employment benefits from undertaking the project in a timely fashion."

Appellants do not show the City's approval of the bonds was "arbitrary, capricious, or entirely lacking in evidentiary support." (*Poway Royal Mobilehome Owners Assn. v. City of Poway*, *supra*, 149 Cal.App.4th at p. 1479.) The record reflects the City's financial advisors identified and notified the City that it needed $30 million for road repair and $8 million to finance software upgrades. As a way to promptly fund the road repairs and implement the next phases of the software upgrade, the City's financial advisors proposed the issuance of the 2022 bonds, utilizing the 2019 bonds structure, which allowed for pooling of the leased properties to provide security for the 2022 bonds.

The City's chief financial officer identified a strategic priority of the 2022 bonds funding was to "minimize the impact to the General Fund over the next 10-15 years." The bond funding would allow the City to obtain upfront funding for roadwork and the software upgrades, instead of conducting the work piecemeal at potentially higher costs. It would also allow the City to avoid deferring road repairs until funding is available and/or avoid using the general fund. The City could have rationally concluded that the lease-leaseback funding structure would minimize the impact on the general fund while allowing the street improvements and software upgrades to move forward expeditiously. (See *Rider*, *supra*, 18 Cal.4th at p. 1047 [multi-year lease contracts allow local governments to avoid price volatility from year to year and to negotiate lower prices overall].)

Based on this record, we will not disturb the approval of the two lease revenue bonds.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover costs on appeal.


BALTODANO, J.


We concur:


GILBERT, P. J.


CODY, J.

20

Mark S. Borrell, Judge

Superior Court County of Ventura

_____

Craig A. Sherman for Plaintiffs and Appellants.

Best Best & Krieger, Scott W. Ditfurth and Andrew G. Saghian for Defendants and Respondents and for Real Parties in Interest.

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| MOVING OXNARD FORWARD, INC., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF OXNARD et al., <br><br> Defendants and Respondents; <br><br> OXNARD COMMUNITY DEVELOPMENT COMMISSION SUCCESSOR AGENCY et al., <br><br> Real Parties in Interest. | 2d Civ. Nos. B334636, B335866 <br> (Super. Ct. No. 56-2022-00573015-CU-JR-VTA) <br> (Ventura County) <br><br> ORDER CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on April 25, 2025, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published

in the Official Reports and it is so ordered.

There is no change in judgment.

_____

GILBERT, P. J.             BALTODANO, J.             CODY, J.