[No. E039762. Fourth Dist., Div. Two. Sept. 27, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
OMAR MARES, Defendant and Appellant.

[No. E042136. Fourth Dist., Div. Two. Sept. 27, 2007.]

In re OMAR MARES on Habeas Corpus.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.110.1, this opinion is certified for publication with the exception of parts III.A.–B., and D.–E.

**COUNSEL**

Daphne Sykes Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Rhonda Cartwright-Ladendorf and Kristen K. Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MILLER, J.—**

## I.

## INTRODUCTION

Defendant Omar Mares[1] walked into a bank, armed with a car dealership's bank account number, and allegedly asked the bank teller, "Is this my account?" Without verifying that the account actually belonged to defendant, the teller gave him $5,000 from the dealership's account. The teller also gave defendant bank statements showing the account contained $4 million.

Not content with a mere $5,000, defendant continued his escapade by traveling to the car dealership, whereupon he insisted he had a $34,000 credit. He demanded they give him $20,000 of it back and use the remaining $14,000 towards the purchase of a new vehicle. Once the dealership discovered it was *their* $4 million account, and not defendant's, they called the police.

Defendant was arrested and charged with two counts of burglary and one count of possessing a completed check with the intent to defraud. The matter was tried to a jury. After deliberating 10 minutes, the jury convicted defendant on all counts.

Defendant has filed a petition for writ of habeas corpus, which we consider concurrently with this appeal. In his habeas corpus petition, defendant alleged ineffective assistance of counsel. Similarly in his appeal, defendant argues several errors were committed, including ineffective assistance. They are: (1) trial counsel rendered ineffective assistance in failing to present a mental

---

[1] Who does not own, and is not employed by, a car dealership.

illness defense, (2) the "mistake of fact" instruction erroneously required defendant's belief—that he had a $4 million bank account—be "reasonable," (3) trial counsel rendered ineffective assistance when she failed to object to the mistake-of-fact instruction, (4) a bank withdrawal slip does not qualify as a "check" for purposes of Penal Code[2] section 475, subdivision (c), and (5) instructing jurors that a withdrawal slip qualifies as a check lowered the prosecution's burden to prove defendant possessed a completed check.

We conclude that the trial court erred when it instructed jurors that the mistake of fact had to be actual and reasonable, when in fact an unreasonable belief was sufficient to negate specific intent. However, we find the error was harmless because defendant's planning and sophistication belied his mistake-of-fact defense. Finding no other errors, we affirm the judgment. We also deny the petition for writ of habeas corpus on the merits.

## II.

## FACTUAL AND PROCEDURAL HISTORY

On December 20, 2004, defendant went to an upscale car dealership and test drove a luxury car. In the car-sales industry, when someone wants to pay for a vehicle in full, it is a custom and practice to offer customers the option to wire transfer funds into the dealership's bank account. At this particular dealership, salesmen have on their desks wire transfer forms containing the dealership's name, routing number, and bank account number. They would hand a wire transfer form to a customer to facilitate the transfer of the purchase price of a car from the customer's bank account to the dealership's bank account. Normally, a sales representative would only provide a customer with a wire transfer form if a purchase contract was signed; however, a "laissez faire" attitude amongst the sales staff sometimes caused a salesperson to give a buyer a form without a completed purchase agreement.

Some time before January 20, 2005, defendant withdrew $500 from his brother Daniel Mares's (Daniel) IRA account located at Daniel's credit union. When Daniel went to his credit union on January 20 to withdraw money from his account, the credit union refused the transaction, informing him he was "$500 short." A credit union representative showed Daniel a document containing defendant's signature for a $500 withdrawal made a couple of days earlier. When Daniel confronted defendant about the withdrawal, defendant said he believed that he, too, had an account at the credit union and was trying to withdraw money from his own account.

---

[2] All further statutory references will be to the Penal Code unless indicated.

On January 28, 2005, defendant went to the bank where the car dealership had a $4 million payables account. Defendant presented a teller with a preprinted form folded into fourths, showing the dealership's account number. On the unexposed side of the folded paper was the name of the dealership. Defendant told the teller he "wanted to make a [$5,000] withdrawal." The teller swiped defendant's identification; filled out, for defendant, a withdrawal slip for $5,000; and then handed it to defendant to look over and sign. Since the withdrawal amount exceeded the amount she was authorized to disburse, the teller asked her manager for approval, which he signed without ensuring it was correct. Neither the teller nor the authorizing bank manager verified defendant's name and signature with those on the account.

Written on the withdrawal slip were a requested $5,000 withdrawal amount, an account number, a date, and defendant's signature. After the withdrawal was approved by the manager, the teller wrote on the back of the withdrawal slip the account balance, the date it was opened, and a printed transaction number. The withdrawal slip was then placed into a computer to validate the withdrawal, and the withdrawn amount was printed on the back as a receipt.

Defendant requested the teller print out the bank statements for that account. She handed him three documents: (1) an instant statement containing the account number, account name, the branch number, various transactions to and from the account, the current balance and the current transaction; (2) an internal branch cash withdrawal printout showing the most recent transaction of funds coming out of the account, which was to be used solely by the bank; and (3) an internal branch printout for bank use only, listing dates of the account's most recent activity, with deposits totaling $34,551.83.

After receiving the three statements, defendant took the documents to the dealership. Showing the bank statements to the salesman, defendant claimed he had a $34,000 credit; he wanted to apply $14,000 towards the purchase price and wanted $20,000 refunded to him. The inexperienced salesman asked the sales manager how to process this unusual transaction, and the sales manager immediately became suspicious because there is no such thing as "having credit" at a car dealership. Furthermore, he found it unusual that a customer would hurriedly want to complete a $40,000 car purchase in a matter of minutes.

When the business manager was consulted, it was discovered that the bank account numbers for the funds for which defendant claimed a credit were

actually the dealership's accounts. When the dealership's managers refused to return the bank statements to defendant, he became irate and contacted the police. When the officers arrived to conduct an investigation, defendant told the officers that the monies in the bank account came from a church, which donated $4 million to him. He later changed his story by saying he didn't know how the money got into "his" account.

Defendant was charged with two counts of burglary (§ 459) and one count of possessing a completed check with intent to defraud (§ 475, subd. (c)). The matter went to trial before a jury.

During an Evidence Code section 402 hearing, the prosecution made a motion to exclude any reference to defendant's mental health history on the grounds it was irrelevant to the issues in the case. Defense counsel stated she was not aware of defendant's mental health history. The only mental health reference she knew of was a statement made by defendant's brother Daniel to a police officer.[3] She informed the trial court she would not ask Daniel any questions regarding defendant's mental health.

At trial, defendant testified as a witness on his own behalf. He stated that he received some paperwork with account numbers on it and went to the bank to see if the account was "his." The teller told him, " '[Y]our name is the only one on [the account].' " Defendant also testified that when he received the statement from the teller showing the $4 million balance, he confirmed that "[i]t looked like an accurate balance to [him]." He then thanked her and said, " 'Yeah, that's all mine.' " The teller also informed him the bank had wired $34,551.43 to the dealership. He responded, "[W]onder-ful. $34,551.43." Defendant then traveled to the car dealership to clear up the issue of whether he had a credit balance. He testified he was not interested in buying a car but wondered where "his" money was.

At the trial's conclusion, the jury found defendant guilty of all charges. The trial judge heard a probation violation hearing concurrently with the trial and found defendant in violation of his probation.

At sentencing, the trial court placed defendant on formal probation; sentenced him to one year in jail; and as a term and condition of probation, ordered a psychological evaluation. The trial judge believed defendant suffered from a mental health disorder that required treatment; hence, it referred

---

[3] Daniel's statement to the officer is not found anywhere in the appellate record.

the matter to the mental health court to determine whether defendant's probation terms should be modified to provide appropriate housing and treatment. Defendant objected to the psychological evaluation as a term and condition of probation. In the end, defendant agreed to that term because it avoided his being sentenced to state prison.

In order to provide the court with a mental health evaluation, a clinical psychologist interviewed defendant. The psychologist opined that defendant had a "Delusional Disorder, Grandiose and Persecutory Types."[4]

## III.

## DISCUSSION

### A.–B.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### C. *A Withdrawal Slip Qualifies As a "Completed Check" for Purposes of Section 475, Subdivision (c)*

Defendant contends he cannot be convicted of possessing a completed check with the intent to defraud because a bank's withdrawal slip does not fall squarely within the plain meaning of the term "check." Citing *People v. Norwood* (1972) 26 Cal.App.3d 148 [103 Cal.Rptr. 7] (*Norwood*), defendant argues that he can only be criminally liable for possessing those negotiable instruments listed in the statute: a completed check, money order, traveler's check, warrant or county order. Since the Legislature did not enumerate "withdrawal slip" as a commercial paper prohibited in section 475, that element of the crime has not been established. He also claims the withdrawal slip was "not in the form of" a completed check: a check is a draft signed by the maker or drawer, drawn on a bank, payable on demand, and has unlimited

---

[4] There is a consensus among the psychological community that there is no effective treatment for delusional disorder, although individual therapy and psychotropic medications may help. The nature of the illness prevents the establishment of a therapeutic relationship due to distrust, suspiciousness, lack of insight into illness, and disinterest in the opinion of others.

[*] See footnote, *ante*, page 1007.

negotiability. On the other hand, the withdrawal slip is a blank form, accessible to the public, which was completed by the teller and signed by defendant.

Below is a representation of a blank withdrawal slip the teller used to fill out the withdrawal request for defendant:

| | |
|---|---|
| WITHDRAWAL | DATE_____ |
| CUSTOMER NAME | SIGNATURE-Please sign in teller's presence for cash received. |
| AMOUNT_____DOLLARS | |
| BANK NAME    ACCOUNT NUMBER    AMOUNT<br>#    $ | |

Section 475, subdivision (c) provides: "Every person who possesses any completed check, money order, traveler's check, warrant or county order, whether real or fictitious, with the intent to utter or pass or facilitate the utterance or passage of the same, in order to defraud any person, is guilty of forgery."

██ A "check" is defined as: "(1) a draft, other than a documentary draft, payable on demand and drawn on a bank, (2) a cashier's check or teller's check, or (3) a demand draft. An instrument may be a check even though it is described on its face by another term, such as 'money order.' " (Cal. U. Com. Code, § 3104, subd. (f).) A "draft" is an order to pay upon demand and includes a check. (Cal. U. Com. Code, § 3104, subd. (e); U. Com. Code com. No. 4, 23A pt. 2 West's Ann. Cal. U. Com. Code (2002 ed.) foll. § 3104, p. 177.) A bank may honor any check, receipt, or order of withdrawal from a commercial account when an authorized person on the account makes a withdrawal. (Fin. Code, § 953.)

██ We find that the withdrawal slip filled out by the teller at defendant's request was a completed check for purposes of section 475. The withdrawal

slip is a standard form supplied by a bank[8] that the public may use as a "draft." It is a preprinted "order" directing the bank to pay the authorized person on the account a sum certain "upon demand," that is, when they sign the slip and hand it over to the teller. It matters not whether the "draft" was in the form of a withdrawal slip or a personal check. In either case, filling out a personal check payable to oneself, or filling out a bank's withdrawal slip, is the same in effect. What matters is that the essential elements of a negotiable instrument are met: it is an unconditional order to pay a fixed amount of money payable on demand to the bearer. (Cal. U. Com. Code, § 3104, subd. (a).) Defendant's signature on the bank's form requesting immediate payment of $5,000 to himself was a "completed check." Since a "check," by definition, is a "draft" (an unconditional order for immediate payment to the bearer), the withdrawal slips satisfies the element that defendant possess a "completed check" for purposes of section 475.

*Norwood* is distinguishable. The court in that case ruled that the county warrant the defendant possessed was not considered a completed check under section 475. The county warrant was not a negotiable instrument drawn on a bank directing the depository of funds to make payments to the payee. (*Norwood*, *supra*, 26 Cal.App.3d at pp. 154–155.) The warrant did not look like a traveler's check, and it was not a money order because no fee was paid by the purchaser to the issuer of the instrument. (*Id.* at pp. 155–156.) Since the county warrant did not fall into any of those three categories of instruments, there was insufficient evidence the defendant possessed a "completed check" with the intent to defraud.

██ Here, however, the withdrawal slip explicitly ordered the bank to withdraw $5,000 from the car dealership's commercial account and pay it to defendant when he signed the withdrawal slip. It directed the bank, where the dealership's funds were deposited, to disburse funds to the payee—defendant. Therefore the unconditional demand directing the bank to distribute funds to defendant constituted a check.

D.–E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[8] Pursuant to Evidence Code sections 459, subdivision (a) and 452, subdivision (g), we take judicial notice of ordinary banking procedures.

*See footnote, *ante*, page 1007.

## IV.

## DISPOSITION

The judgment is affirmed and the petition for writ of habeas corpus is denied on the merits.

Ramirez, P. J., and King, J., concurred.

A petition for a rehearing was denied October 25, 2007, and on October 5, 2007, and October 25, 2007, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied January 16, 2008, S157929.