Filed 4/29/24

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| CITY OF SAN JOSÉ, | H050889 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 21CV391517) |
| v. | |
| HOWARD JARVIS TAXPAYERS ASSOCIATION et al., | |
| Defendants and Appellants. | |


In this appeal, we consider the application of the constitutional debt limitation to a municipality's constitutional obligation to its employees to make promised pension payments and its duty to ensure pension plans have sufficient assets to be actuarially sound.

Article XVI, section 18, subdivision (a) of the California Constitution sets forth the constitutional debt limitation applicable to cities. It states in relevant part: "No . . . city . . . shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters of the public entity voting at an election to be held for that purpose." (Cal. Const., art. XVI, § 18, subd. (a).)

This provision, which "mandat[es] balanced budgets" (*Rider v. City of San Diego* (1998) 18 Cal.4th 1035, 1045 (*Rider*)), has been part of the California Constitution since 1879. It was enacted in response to "municipal extravagance" (*San Francisco Gas Co. v.*

*Brickwedel* (1882) 62 Cal. 641, 642 (*San Francisco Gas*)) by local governments making large capital investments and thereby "creating huge long term debts." (*Compton Community College etc. Teachers v. Compton Community College Dist.* (1985) 165 Cal.App.3d 82, 88 (*Compton Community College*).)

Courts have identified exceptions to the constitutional debt limitation, including the "special fund doctrine" (*City of Oxnard v. Dale* (1955) 45 Cal.2d 729, 733 [debt limitation not violated by obligations payable solely from a special fund]), obligations imposed by law (*City of Long Beach v. Lisenby* (1919) 180 Cal. 52, 57 (*Lisenby*) [debt limitation has "no application to cases of indebtedness or liability imposed by law or arising out of tort"]), and contingent obligations (*Rider*, *supra*, 18 Cal.4th at p. 1047 [debt limitation inapplicable to "multiyear contracts in which the local government agrees to pay in each successive year for land, goods, or services provided during that year" because each payment is a contemporaneous payment for the property, goods, or services rather than an installment payment on a long-term debt]; see also *Taxpayers for Improving Public Safety v. Schwarzenegger* (2009) 172 Cal.App.4th 749, 763).

Howard Jarvis Taxpayers Association, Citizens for Fiscal Responsibility, and Pat Waite (collectively, HJTA) argue that the City of San José (city) violated the constitutional debt limitation when its city council adopted a resolution authorizing the issuance and sale of bonds, on the condition they result in a savings to the city, to address a shortfall in the city's pension plans. In validation proceedings, the trial court upheld the city's actions against a challenge by HJTA, deciding that the bond issuance falls under the obligation imposed by law exception to the debt limitation. HJTA appeals the judgment, contending the city's actions violate the constitutional debt limitation and lack statutory authority.

We affirm the judgment, but our reasoning differs from that of the trial court. We decide that under the terms of the challenged resolution, the city has not "incur[red] any indebtedness or liability in any manner or for any purpose exceeding in any year the

2

income and revenue provided for such year." (Cal. Const., art. XVI, § 18, subd. (a).) Because the city's actions do not trigger the constitutional debt limitation, we need not consider the applicability of its exceptions. We furthermore conclude the city has the authority under state law to issue the bonds.

## I. FACTS AND PROCEDURAL BACKGROUND[1]

San José is a charter city, whose current charter took effect on May 4, 1965. (City of San José City Charter, adopted 1965.)[2] The City Council established the city's current Federated City Employees Retirement System (federated plan) in 1975 (San José Mun. Code, ch. 3.28, § 3.28.010) and its current Police and Fire Department Retirement Plan (police and fire plan) in 1961 (San José Mun. Code, ch. 3.36, § 3.36.010) (collectively, the retirement plans or pension plans), pursuant to the city's authority under the charter. (Charter, art. XV, § 1500.)

Under the retirement plans, pension benefits for individual city employees vary based on factors such as age, final salary, years of service, type of retirement, and any cost of living adjustments (COLAs). According to the city's actuarial expert, "[t]he exact amount of the pension benefit an active employee will receive upon retirement cannot be known until their retirement date, since it depends on their years of service and pensionable earnings. The current pension benefits of retirees are known, but their future benefits will depend on cost of living and on how long they and their beneficiaries live."

The city makes annual contributions (described in the record as the "normal cost" or "[c]urrent [o]bligation") to fund the retirement plans. If the normal cost does not cover the present value of providing vested retirement benefits, an unfunded liability arises. An unfunded liability is the difference between the present value of future retirement benefits that have been earned as of the valuation date and the assets the city has currently set

---

[1] We take these undisputed facts from the evidence admitted at the court trial and the matters of which the trial court took judicial notice.

[2] All subsequent charter references are to City of San José City Charter.

3

aside to pay for them.  (San José Mun. Code, ch. 3.28, § 3.28.960.)  According to the city's actuarial expert, an unfunded liability is "often large enough that it is not practical for the employer . . . to pay the entire amount all at once.  Instead, it is paid over time" or amortized.  While the city pays the "normal cost" on an annual basis, the "unfunded liability" can refer to either the liability for any particular year or the amount of liability accumulated over the years as of the valuation date.  The "current plan assets" are those assets the city has set aside to pay for the retirement benefits as of a particular valuation date.  The amount of the city's unfunded liability is based in part on the discount rate, the current expected annual rate of return on the city's investments—estimated in 2020 and 2021 to be 6.625 percent.

The city's actuary calculates annually the amount of the unfunded liability for each retirement plan, taking into account a combination of factors, including the performance of the city's investments, city employees' actual retirement and mortality patterns, and changes in actuarial assumptions and methods.  The city's unfunded liability has grown not because of increases in promised benefits, but because declining interest rates on the expected rate of return on the city's investments, as well as changes to certain assumptions about demographic factors, including mortality and retirement rates, have affected the present value of future pension payments.  As of June 30, 2020, the total unfunded liability was approximately $1,383,387,000 for the police and fire plan and $2,099,614,000 for the federated plan.

In April 2021,[3] the city considered options for paying the unfunded liability to return the retirement plans to actuarially sound footings.  The city determined that it would seek approval by resolution of the issuance of pension obligation bonds.  Under the plan selected by the city, the city council would not be obligated to issue the pension

---

[3] Unless otherwise specified, all dates were in 2021.

obligation bonds and the timing of any bond issuance would depend on prevailing market conditions.

On October 5, the city passed a resolution which authorized the issuance of pension obligation bonds pursuant to Government Code section 53570 et seq.[4] "in a maximum principal amount not to exceed that required to refund [(i.e., repay)] the [u]nfunded [l]iability, to prepay all or a portion of the city's annual required retirement contribution . . . (the '[c]urrent [o]bligation'), and to pay the costs of issuance of such [b]onds," subject to certain conditions. The resolution gave the city discretion to determine the final principal amount of the bonds, provided that the aggregate amount of the bonds "shall not be greater than the lesser of (a) $3.5 billion or (b) the sum of the [c]ity's [u]nfunded [l]iability and [c]urrent [o]bligation . . . together with the costs of issuing the [b]onds" and the issuance of the bonds results in savings to the city. The bonds would be issued at a lower interest rate than the current expected 6.625 percent rate of return on the city's investments. The resolution also authorized the issuance of additional bonds on similar terms and conditions, as long as they would result in savings to the city.

The resolution authorized the preparation and prosecution of validation proceedings[5] pursuant to Code of Civil Procedure section 860 et seq. to determine the validity of the bonds and related agreements. On November 18, in accordance with the terms of the resolution, the city filed a complaint for validation with the trial court "to determine the validity of the proceedings and obligations relating to the [c]ity's issuance of one or more series of pension obligation refunding bonds, execution of a trust

---

[4] Unspecified statutory references are to the Government Code.

[5] "Validation proceedings are a procedural 'vehicle' for obtaining an expedited but definitive ruling regarding the validity or invalidity of certain actions taken by public agencies." (*Santa Clarita Organization for Planning & Environment v. Castaic Lake Water Agency* (2016) 1 Cal.App.5th 1084, 1096.)

5

agreement and a bond purchase agreement, and approving additional actions related thereto."

On December 9, pursuant to California Rules of Court, rules 3.1200 et seq. and Code of Civil Procedure sections 861 and 861.1, the city filed an ex parte application seeking an order to issue, publish, and mail the summons, and to set a deadline for filing an answer to the complaint for validation. The following day, the trial court issued an order granting the city's application.

HJTA filed an answer to the complaint for validation, alleging that the city lacked authority to issue the bonds because it had not obtained the approval of two-thirds of its voters, is not subject to any " 'obligation imposed by law' " that would exempt the bond issuance from the debt limitation set forth in article XVI, section 18, subdivision (a) of the California Constitution, and failed to state facts sufficient to constitute a cause of action.[6] HJTA asked the court to deny the relief requested in the complaint for validation and declare the invalidity of the resolution and the proposed issuance of bonds.

On February 16, 2023, the trial court entered judgment validating the resolution, the issuance and sale of the bonds, and the execution and delivery of the trust agreement, the bond purchase agreement, and supplemental and related contracts and agreements. The court held that the city is "required under the [c]harter to establish, fund and maintain actuarially sound [r]etirement [p]lans," and, that, to maintain such actuarially sound retirement plans, "the [c]ity is required to pay the [u]nfunded [l]iability." The court reasoned that, since the establishment, funding, and maintenance of actuarially sound retirement plans are obligations imposed by law, the issuance of the proposed bonds is exempt from the constitutional debt limitation set forth in article XVI, section 18 of the California Constitution.

---

[6] The city filed a motion to strike HJTA's answer as untimely filed. The trial court denied the city's motion. The timeliness of HJTA is not at issue in this appeal.

## II.  DISCUSSION

HJTA argues the city's actions violate the constitutional debt limitation provision. HJTA maintains that, with the resolution, the city "proposes to incur a debt exceeding the current year's income," which is unconstitutional absent voter approval.  HJTA denies that the city already has an obligation to pay the unfunded liability (rendering it a preexisting debt), because the unfunded liability is not a fixed dollar amount that is currently due and payable.  Further, HJTA contends the city lacks statutory authority to issue the bonds as refunding bonds because the unfunded liability cannot be characterized as " 'revenue bonds' " under section 53583.

HJTA argues that issuance of the proposed new bonds would create "new debt"— rather than convert existing debt—an action HJTA alleges requires voter approval on the grounds that "if there is no obligation imposed by law in the first place, new financing of something else is not constitutionally authorized without voter approval."  HJTA contends the unfunded liability is not a debt but is merely "an actuarial projection."  It characterizes the city's actions as "prepayment of future pension benefits."

The city responds to HJTA's constitutional claim in two ways.  It argues the imposed by law exception applies because the city is obligated by the terms of the city charter to provide actuarily sound pension plans, which includes paying the unfunded liability.  Alternatively, the city maintains that the proposed bond issuance does not implicate the constitutional debt limitation at all.  The resolution authorizing the issuance of the bonds states that the bonds can be issued only if they result in savings to the city. As the city already owes the unfunded liability to its current and former employees, issuance of the bonds merely changes the form of an existing debt and does not contravene the constitutional debt limitation.  In addition, the city asserts statutory authority to issue the bonds under section 53583, subdivision (a).

A. *Legal Background*

    1. City Charters

Under article XI, section 3 of the California Constitution, "a county or city may adopt a charter by majority vote of its electors voting on the question." (Cal. Const., art. XI, § 3, subd. (a).) The Constitution further provides that "[a] charter may be amended, revised, or repealed in the same manner." (*Ibid*.) "The charter of a municipality is its constitution" (*Brown v. City of Berkeley* (1976) 57 Cal.App.3d 223, 231), and "a charter city may not act in conflict with its charter." (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 171 (*Domar*).)

    2. Public Employee Pensions

Pensions are " 'an integral part of the employment contract' " (*Carman v. Alvord* (1982) 31 Cal.3d 318, 332 (*Carman*)) that "help induce faithful public service and provide agreed subsistence to retired public servants who have fulfilled their employment contracts." (*Id*. at p. 325, fn. 4.) As such, " 'pension laws are to be liberally construed to protect pensioners and their dependents from economic insecurity.' " (*County of Orange v. Association of Orange County Deputy Sheriffs* (2011) 192 Cal.App.4th 21, 41 (*County of Orange*).)

"A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment" (*Betts v. Board of Administration* (1978) 21 Cal.3d 859, 863 (*Betts*)), or " 'upon the performance of services for a public employer.' " (*Cal Fire Local 2881 v. California Public Employees' Retirement System* (2019) 6 Cal.5th 965, 985 (*Cal Fire*).) "While payment of these benefits is deferred, and is subject to the condition that the employee continue to serve for the period required by the statute, the mere fact that performance is in whole or in part dependent upon certain contingencies does not prevent a contract from arising, and the employing governmental body may not deny or impair the contingent

8

liability any more than it can refuse to make the salary payments which are immediately due." (*Kern v. City of Long Beach* (1947) 29 Cal.2d 848, 855 (*Kern*).)

A public employee's pension rights "may not be destroyed, once vested, without impairing a contractual obligation of the employing public entity." (*Betts*, *supra*, 21 Cal.3d at p. 863.) The employee's vested right "is their reasonable expectation that the city would meet its statutory obligations to finance the unfunded liability for past accumulated debt." (*Association of Blue Collar Workers v. Wills* (1986) 187 Cal.App.3d 780, 792.)

Both state and municipal law require that the city's pension plans be actuarily sound. State law provides that "any city may establish a retirement system for its officers and employees and provide for the payment of retirement allowances, pensions, disability payments, and death benefits, or any of them." (§ 45301.) Further, it requires that a city pension or retirement system "be on a sound actuarial basis." (§ 45342; see also *Valdes v. Cory* (1983) 139 Cal.App.3d 773, 785, fn. 5 (*Valdes*) [observing this statute "requires cities which elect to adopt their own retirement system [] do so on a 'sound actuarial basis' "].)

Article XV, section 1500 of the charter, as last amended and approved by the voters on November 2, 2010, states that "the [c]ouncil shall provide, by ordinance or ordinances, for the creation, establishment and maintenance of a retirement plan or plans for all officers and employees of the [c]ity. . . . [T]he [c]ouncil shall not establish any new or different plan after November 3, 2010 that is not actuarially sound." (Charter, art. XV, § 1500.)

Article XV, section 1504 of the charter reinforces this requirement. "Any retirement plan or system established for officers or employees of the [p]olice or [f]ire [d]epartments shall be actuarially sound." (Charter, art. XV, § 1504, subd. (c).) In addition, article XV-A, section 1508-A, subdivision (a) of the charter, recognizing "the interests of the taxpayers and the responsibilities to the plan beneficiaries," requires all

9

pension plans to "be operated in conformance with [a]rticle XVI, [s]ection 17 of the California Constitution" (also known as the 1992 California Pension Protection Act), including subjecting all plans "to an annual actuarial analysis that is publicly disclosed in order to assure the plan has sufficient assets." Article XVI, section 17, subdivision (e) of the California Constitution provides, in relevant part, that "[t]he retirement board of a public pension or retirement system, consistent with the exclusive fiduciary responsibilities vested in it, shall have the sole and exclusive power to provide for actuarial services in order to assure the competency of the assets of the public pension or retirement system."

The two retirement plans at issue are codified in the city's municipal code at title 3, chapters 3.28 et seq. (federated plan) and 3.36 et seq. (police and fire plan), respectively. Under both plans, the city's retirement board is charged with "maintaining the actuarial soundness" of the plans consistent with article XVI, section 17 of the California Constitution. (See, e.g., San José Mun. Code, ch. 3, §§ 3.28.200.A, 3.28.350.B, 3.36.540.B.)

3. Bond Issuance

Section 53583, subdivision (a) of the Government Code permits any local agency to "issue bonds pursuant to this article or any revenue bond law under which the local agency is otherwise authorized to issue bonds for the purpose of refunding any revenue bonds of the local agency."[7] Section 53580, subdivision (c) defines " 'refunding bonds' " as "bonds issued to refund bonds." Section 53550, subdivision (b) defines " '[b]onds' " as, in relevant part: "[B]onds, warrants, notes or other evidence of indebtedness of a local agency." Section 53570, subdivision (b)(1) defines " '[r]evenue bonds' " as, in

---

[7] A " 'local agency' " is defined under section 53580, subdivision (a) as "public district, public corporation, authority, agency, board, commission, county, city and county, city, school district, or other public entity or any improvement district or zone thereof."

10

relevant part:  "Bonds, warrants, notes, or other evidence of indebtedness of a local agency payable from funds other than the proceeds of ad valorem taxes or the proceeds of assessments levied without limitation as to rate or amount by the local agency upon property in the local agency."

The proceeds of any refunding bonds issued pursuant to article 11 of the Government Code "may be applied to the purchase, retirement at maturity, or redemption of the bonds to be refunded either at their earliest redemption date or dates, any subsequent redemption date or dates, upon their purchase or retirement maturity, or paid to a third person to assume the local agency's obligation to make the payments, and may, pending that application, be placed in escrow and invested or reinvested in any obligations or securities, and any interest or other increment earned or realized on any such investment may be applied to the payment of the bonds to be refunded or to the payment of interest on the refunding bonds, as provided in the proceedings of the local agency authorizing the issuance of the refunding bonds."  (§ 53584.)

In addition, article XII, section 1222 of the charter authorizes the city to issue revenue bonds "for any purposes other than those specified in [s]ections 1220 [for off-street parking or airport facilities] and 1221 [for public utilities] only under and pursuant to the laws of the State of California."

B.  *Analysis*

In considering the applicability of article XVI, section 18 to the challenged resolution, "we apply the familiar principles of constitutional interpretation, the aim of which is to 'determine and effectuate the intent of those who enacted the constitutional provision at issue.' "  (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 444 (*Silicon Valley Taxpayers' Assn.*).)  In doing so, we "look first to the language of the constitutional text, giving the words their ordinary meaning."  (*Leone v. Medical Board* (2000) 22 Cal.4th 660, 665.)  We review

11

questions of constitutional and statutory interpretation de novo.[8] (*City of Lafayette v. East Bay Mun. Utility Dist.* (1993) 16 Cal.App.4th 1005, 1013.) "[W]e construe [a] charter in the same manner as we would a statute." (*Domar*, *supra*, 9 Cal.4th at p. 171.)

When reviewing and interpreting a statute, " 'our fundamental task [] is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language "in isolation." [Citation.] Rather, we look to "the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]" [Citation.] That is, we construe the words in question " 'in context, keeping in mind the nature and obvious purpose of the statute . . . .' [Citation.]" [Citation.] We must harmonize "the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole." ' " (*San Diegans for Open Government v. City of San Diego* (2015) 242 Cal.App.4th 416, 428–429 (*San Diegans*).) " 'Where uncertainty exists, consideration should be given to the consequences that will flow from a particular interpretation.' " (*Kerollis v. Department of Motor Vehicles* (1999) 75 Cal.App.4th 1299, 1304–1305.)

### 1. Constitutional Debt Limitation

We begin by examining the legal status of the city's obligation to pay the unfunded liability.

The charter states that the city "shall provide, by ordinance or ordinances, for the creation, establishment and maintenance of a retirement plan or plans for all officers and employees of the City." (Charter, art. VX, § 1500.) Article XV-A, section 1508-A of the charter, read together with article XVI, section 17 of the California Constitution and

---

[8] Although the city asserts there are factual issues in dispute related to the accounting standards, we disagree with this characterization and apply de novo review to the questions at issue in this appeal.

12

section 45342, requires that the city do so on an actuarially sound basis "to assure the competency of the assets of the public pension or retirement system." (Charter, art. XV-A, § 1508-A; Cal. Const., art. XVI, § 17, subd. (e); § 45342.) The use of the term "shall" in this context describes a legal obligation. (See *Wright v. Compton Unified Sch. Dist.* (1975) 46 Cal.App.3d 177, 181–182.) Public employees have "a vested right to 'integrity and security of the source of funding for the payment of [pension] benefits.' " (*Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1136 (*Wilson*).)

In approving the charter, the city's voters enacted the city's obligation to provide actuarially sound pension plans to its officers and employees. On November 8, 2016, the voters reaffirmed their support of the city's retirement plan obligations, including its obligation to maintain the plans on an actuarially sound basis, by approving Measure F.[9]

California law has long held that a municipality that has enacted a pension plan incurs an obligation, protected by the constitutional contract clause (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9), to make pension payments to covered employees. In *Kern*, the California Supreme Court rejected the contention that a city could escape the obligation to pay a pension to a city firefighter by repealing the pension provisions before the employee was entitled to retire. The court reasoned "there is little reason to make a distinction between the periods before and after the pension payments are due. It is true that an employee does not earn the right to a full pension until he has completed the prescribed period of service, but he has actually earned some pension rights as soon as he has performed substantial services for his employer." (*Kern*, *supra*, 29 Cal.2d at p. 855.)

Our Supreme Court in *Kern* decided that the city incurred the obligation to pay the employee the pension payments in the same way—and at the same time—as it did his

___

[9] Measure F amended article XV-A of the charter in accordance with the statement of decision in *San Jose Police Officers Association v. City of San Jose, et al.* (Feb. 20, 2014, No. 1-12-CV225926) to require voter approval of any increases in employee retirement benefits, modify disability retirement benefits, and maintain the retirement plans in an actuarially sound manner.

13

salary.  The employee "is not fully compensated upon receiving his salary payments because, in addition, he has then earned certain pension benefits, the payment of which is to be made at a future date.  While payment of these benefits is deferred, and is subject to the condition that the employee continue to serve for the period required by the statute, the mere fact that performance is in whole or in part dependent upon certain contingencies does not prevent a contract from arising, and the employing governmental body may not deny or impair the contingent liability any more than it can refuse to make the salary payments which are immediately due.  . . .  [I]n our opinion it cannot do so at any time after a contractual duty to make salary payments has arisen, since a part of the compensation which that employee has at that time earned consists of his pension rights." (*Kern*, *supra*, 29 Cal.2d at p. 855.)

In other words, "the receipt of pension benefits is granted constitutional protection because the benefits constitute a portion of the compensation awarded by the government to its employees, paid not at the time the services are performed but at a later time."  (*Cal Fire*, *supra*, 6 Cal.5th at p. 985; *Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020) 9 Cal.5th 1032, 1077 ["It is the nature of pension rights as deferred compensation that caused *Kern* to hold them protected under the contract clause."].)

The California Supreme Court in *Kern* grounded its conclusion that pension rights enjoy constitutional protection on the importance of public employee pensions.  It described that objective as "to induce competent persons to enter and remain in public employment."  (*Kern*, *supra*, 29 Cal.2d at p. 856.)  It added, "It is obvious that this purpose would be thwarted if a public employee could be deprived of pension benefits, and the promise of a pension annuity would either become ineffective as an inducement to public employees or it would become merely a snare and a delusion to the unwary." (*Ibid*.)  Underscoring the special nature of pension obligations in California law, the California Supreme Court has identified only three conditions of public employment as

14

protected by the constitutional contract clause: pensions, earned salary, and judicial compensation. (*Cal Fire*, *supra*, 6 Cal.5th at p. 986.)

Under these principles of California law, the city has an obligation to pay future pension benefits to its current and former employees, who have already earned them. In addition, the city has an obligation to maintain its retirement plans "on a sound actuarial basis" that assures that the plans have the assets to make such future payments. (§ 45342; Cal. Const., art. XVI, § 17, subd. (e).) The city seeks to satisfy this duty by issuing bonds that will enable it to fund its unfunded liability in a manner that reduces the city's costs. It is far from obvious that the challenged resolution triggers the constitutional debt limitation. After all, that provision applies when a city "*incur[s]* any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year." (Cal. Const., art. XVI, § 18, subd. (a), italics added.) The actions that incurred the city's existing liability—enacting the pension plans and employing the individuals covered by them—have already occurred. Further, the unfunded liability in this case arose out of unexpected changes in interest rates and market conditions, rendering inadequate the current assets set aside for pension payments that have already been earned but have not yet been paid.

Nevertheless, HJTA asserts that refunding the unfunded liability cannot be a legally imposed obligation because financial obligations not payable "today" are not debt. In its view, the city's issuance of the bonds incurs a *new* debt, which does trigger the constitutional debt limitation. For this contention, HJTA relies on the decision in *County of Orange*, *supra*, 192 Cal.App.4th at page 34.

In *County of Orange*, the Second District Court of Appeal considered the legality of a county retirement board's modification of the retirement formula in a manner that resulted in higher pension payments for certain public employees. (*County of Orange*, *supra*, 192 Cal.App.4th at pp. 30–31.) Several years later, the county sued the board to rescind the more generous pension terms. The county argued that the board's earlier

15

action violated the constitutional debt limitation because the additional debt exceeded the county's available funds for the year and no exceptions to the constitutional debt limitation applied. (*Id*. at p. 33.) The Court of Appeal rejected the county's argument, ruling that the board's previous decision to change the pension plan did not incur a legally enforceable obligation within the meaning of the constitutional debt limitation. (*Id*. at p. 39.)

We decide that *County of Orange* does not control here. In that case, the Court of Appeal was asked whether the retirement board's estimate of the cost of *increasing* pension benefits triggered the constitutional debt limitation. The court decided that it did not. It described the $100 million of unfunded liability as "an actuarial estimate projecting the impact of a *change in a benefit plan*, rather than a legally enforceable obligation measured at the time of the County's 2001 resolution approving the 3% at 50 formula." (*County of Orange*, *supra*, 192 Cal.App.4th at pp. 36–37, italics added.)

The facts here are materially different. With the challenged resolution, the city does not seek to increase pension benefits but instead to issue bonds to provide an income stream for a liability it has already incurred. As the California Supreme Court said in 1896, "merely to fund or refund an existing debt is not to 'incur an indebtedness or liability' " within the meaning of the constitutional debt limitation. (*City of Los Angeles v. Teed* (1896) 112 Cal. 319, 327 (*Teed*).) "A bond is not an indebtedness or liability—it is only the evidence or representative of an indebtedness; and a mere change in the form of the *evidence* of indebtedness is not the creation of a new indebtedness within the meaning of the constitution." (*Ibid*.)

Contemporary professional accounting standards support the characterization of the unfunded liability as a current debt. The current Government Accounting Standards

16

Board (GASB)[10] standards—GASB Nos. 67 and 68, enacted in June 2012— require governments to include pension plans' unfunded liability as a deficit on their balance sheets. (See Statement No. 67 of the Governmental Accounting Stds. Bd.: Financial Reporting for Pension Plans, an amendment to GASB Statement No. 25, No. 327-B (June 2012) <https://gasb.org/page/ShowPdf?path=GASBS67.pdf&title=GASBS%2067> [as of April 26, 2024], archived at: <https://perma.cc/8TMS-FMWY >; Statement No. 68 of the Governmental Accounting Stds. Bd.: Accounting and Financial Reporting for Pensions, an amendment of GASB Statement No. 27, No. 327-C (June 2012) <https://gasb.org/page/ShowPdf?path=GASBS+68.pdf&title=GASBS%2068> [as of April 26, 2024], archived at: <https://perma.cc/RF5B-DETQ>.)[11]

That the city's obligation to make these pension payments will not occur in a single calendar year does not mean that the obligation is not a debt. As our Supreme Court observed in *Carman*, " 'The term "indebtedness" has no rigid or fixed meaning, but rather must be construed in every case in accord with its context.' [Citations.] It can include all financial obligations arising from contract . . ., and it encompasses 'obligations which are yet to become due as [well as] those which are already matured.' [Citation.] We hold that indebtedness as traditionally understood covers obligations arising under [the c]ity's pension plan." (*Carman*, *supra*, 31 Cal.3d at pp. 326–327.)

When construing whether the city's decision to transform an existing debt (here, the unfunded portion of the future pension payments already earned) into a new form of

---

[10] The GASB is "an independent, private-sector organization, that establishes accounting and financial reporting standards for state and local governments that follow Generally Accepted Accounting Principles" (GAAP). The city follows GAAP.

[11] In *County of Orange*, the court relied in part on the now-superseded GASB Nos. 25 and 27 to reach its conclusion. Under the former provisions, "[w]hile some pension liabilities must be reported on the balance sheet, the [unfunded liability was] not one of them." (*County of Orange*, *supra*, 192 Cal.App.4th at p. 39.) The current version of the standards requires that the unfunded liability be reported as a current deficit on the city's balance sheet.

indebtedness (the bonds) "incur[s] any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year" (Cal. Const., art. XVI, § 18, subd. (a)), we must " 'effectuate the intent of those who enacted the constitutional provision at issue' " (*Silicon Valley Taxpayers' Assn.*, *supra*, 44 Cal.4th at p. 444).

The constitutional debt limitation was enacted for the purpose of curtailing "municipal extravagance" in the form of unchecked capital investments that resulted in large, long-term debt. (*Compton Community College*, *supra*, 165 Cal.App.3d at p. 88; *San Francisco Gas*, *supra*, 62 Cal. at p. 642.) In contrast to disfavored "municipal extravagance," public policy in California encourages pension plans as a means by which governments may induce and reward long-term public service to a municipality's citizens. (See *Bellus v. City of Eureka* (1968) 69 Cal.2d 336, 351; see also *Cal Fire*, *supra*, 6 Cal.5th at p. 983.) Likewise, the charter states that the city's "financial ability to provide basic services is essential to the health, safety, quality of life and well-being of its residents." (Charter, art. XV-A, § 1501-A.)

As our Supreme Court has highlighted, pension benefits for public employees are constitutionally protected "because the benefits constitute a portion of the compensation awarded by the government to its employees, paid not at the time the services are performed but at a later time." (*Cal Fire*, *supra*, 6 Cal.5th at p. 985.) These benefits are currently owed, and "may not be destroyed, once vested." (*Betts*, *supra*, 21 Cal.3d at p. 863.) The city undoubtedly must pay these pension obligations.

The city's ability to manage its pension resources in a financially prudent manner forms part of its constitutional contractual obligation to its employees. "[U]nder California law there is a strong preference for construing governmental pension laws as creating contractual rights for the payment of benefits, and when feasible to do so such laws should be construed as guaranteeing full payment to those entitled to its benefits 'with the provision of adequate funds for that purpose.' " (*Wilson*, *supra*, 52 Cal.App.4th

18

at p. 1131.) "Actuarial soundness of the [pension] system is necessarily implied in the total contractual commitment, because a contrary conclusion would lead to express impairment of employees' pension rights." (*Id*. at p. 1133; see also *Valdes*, *supra*, 139 Cal.App.3d at p. 785, fn. 5.)

We acknowledge that bond issuance carries independent costs. Depending on the terms of the bonds, such an additional cost might well trigger the constitutional debt limitation. However, under the terms of the challenged resolution, the city may not issue the bonds unless they result in a savings to the city.[12]

In fulfillment of its duty under the charter, the city will assess market conditions as they evolve to determine whether the issuance of the bonds, and the terms of any such issuance, will be financially prudent. The city will be exercising its authority to issue the bonds "in a manner tailored to the exigencies of its activities and in the light of the practical considerations of the market place." (*Redevelopment Agency v. Shepard* (1977) 75 Cal.App.3d 453, 459; see also *Lisenby*, *supra*, 180 Cal. at p. 60 [noting that "[i]t rests entirely with the governing body of the town or city to determine" how to manage its indebtedness in light of market trends].)

In summary, under the terms of the city charter, the city has an obligation to provide pensions to city employees and maintain them in an actuarily sound manner. The

---

[12] HJTA points out that the city may miscalculate whether the bond issuance will result in a savings to the city. But HJTA's speculative argument based on hypothetical circumstances is insufficient to show that the city's issuance of the proposed bonds will result in the incurrence of debt that violates the constitutional debt limitation. (*Wilson v. L. A. County Civil Service Com.* (1952) 112 Cal.App.2d 450, 452–453 [" 'A judicial tribunal ordinarily may consider and determine only an existing controversy, and not a[n] . . . abstract proposition.' "]; *Id*. at p. 453 [ " '[A]s a general rule it is not within the function of the court to act upon or decide a . . . speculative, theoretical or abstract question or proposition.' "].) If the city errs in its fiscal calculations, it may be vulnerable to a constitutional challenge at that time. That issue, however, is not currently before us. We are tasked only with examining whether the challenged resolution violates section 18, subdivision (a) of the California Constitution.

unfunded liability in this case consists of pension obligations the city has already incurred, the payment of which is constitutionally protected by the contract clause. The city has elected to fulfill its contractual commitment to its employees to fund those payments in an actuarially sound manner through the issuance of bonds on the condition that they result in a savings to the city. Under these circumstances, we decide that, by passing the challenged resolution, the city has not "incur[red] any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year." (Cal. Const., art. XVI, § 18, subd. (a).) Therefore, the city is not required to seek voter approval before issuing the bonds.

2. Authority to Issue Bonds as Refunding Bonds to Refund Revenue Bonds

HJTA maintains that, because the unfunded liability cannot itself be characterized as "revenue bonds," the city does not have statutory authority to issue the bonds in question as refunding bonds because there are no bonds to refund. The city counters that it has statutory authority to issue the bonds under section 53583, subdivision (a).

Section 53583, subdivision (a) permits the city to "issue bonds for the purpose of refunding any [of the city's] revenue bonds." Under section 53580, " 'refunding bonds' " are defined as "bonds issued to refund bonds" and " 'bonds' " are defined as "bonds as defined in [s]ection 53550, or revenue bonds as defined in [s]ection 53570." (§ 53580, subds. (b), (c).) " 'Bonds' " are defined in section 53550, subdivision (b) as "bonds, warrants, notes or *other evidence of indebtedness*" of a city. (Italics added.) Revenue bonds are defined in section 53570, subdivision (b)(1) as "[b]onds, warrants, notes, or *other evidence of indebtedness*" of the city. (Italics added.)

Whether the city has the authority to issue the bonds turns on whether the unfunded liability is "evidence of indebtedness" as used in sections 53550, subdivision (b) and 53570, subdivision (b)(1). If "evidence of indebtedness" includes the unfunded liability, the city has the authority under section 53583 to issue the bonds. As the city has

20

not cited any authority other than section 53583 to issue the bonds, if the unfunded liability does not qualify as "evidence of indebtedness," we must conclude the city lacks the necessary statutory authority.

HJTA argues that the phrase " 'evidence of indebtedness' " is a term of art that refers to "written *negotiable* instruments" (italics added), which would not encompass the unfunded liability. In support of this claim, HJTA cites to Civil Code section 1916.5, subdivision (b)(5) for the meaning of " ' "[e]vidence of debt," ' " defined therein as " 'a note or negotiable instrument.' "[13] However, Civil Code section 1916.5 limits the use of that definition of "evidence of debt" to "*this section*" (italics added) and states that it is "applicable only to a mortgage contract, deed of trust, real estate sales contract, or any note or negotiable instrument issued in connection therewith." (*Id*., subds. (b)(1), (d).) Civil Code section 1918.5 includes the same definition and similarly limits its use to the chapter in which it appears, chapter 7.5, which governs mortgage loans. (*Id*., subd. (a).) Therefore, by their own terms, the Civil Code definitions are not applicable here.

HJTA also relies upon a provision from the Corporate Securities Law of 1968 (Corp. Code, § 25117). This provision, too, does not directly apply to bonds to fund public employee pensions. (See, e.g., *Hamilton Jewelers v. Department of Corporations* (1974) 37 Cal.App.3d 330, 335.) Nevertheless, our courts have interpreted the definition of "evidence of indebtedness" in the corporate security context as "includ[ing] not only 'a promissory note or other simple acknowledgment of a debt owing [but]' " also " 'all contractual obligations to pay in the future for consideration presently received.' " (*People v. Coster* (1984) 151 Cal.App.3d 1188, 1193; see also *Hamilton*, at p. 334.) City employees' pensions "fall squarely within that definition" (*Coster*, at p. 1193) since pensions are " 'an integral part of the employment contract' " (*Carman*, *supra*, 31 Cal.3d at p. 332) and deferred payment for services rendered during employment (*Kern*, *supra*,

---

[13] This appears to be a typographical error as Civil Code section 1916.5 does not contain a subdivision (b)(5). We assume HJTA intended to reference subdivision (d)(5).

21

29 Cal.2d at p. 855). Therefore, although not directly applicable, the Corporation Code definition does support a broad reading of "evidence of indebtedness."

For its part, the city relies on Government Code section 53583 as statutory authority to issue the bonds. Section 53583 itself delineates the bond issuance authority by referencing two other provisions (sections 53550, subdivision (b) and 53570, subdivision (b)(1)). It is these provisions that define bonds as "bonds, warrants, notes or *other evidence of indebtedness*." (Italics added.)

Neither of these provisions further defines "other evidence of indebtedness." The Government Code defines the phrase in only one instance, which applies to the sale of *state* bonds under title 1.[14] The only question before us in this appeal is the *city*'s authority to issue bonds, which is addressed in a different title of the Government Code, title 5. (§§ 53400–53595.55.) Therefore, the provision applicable to state bonds, too, is inapplicable.

Having examined HJTA's arguments to the contrary, we conclude that the Government Code does not specifically define the phrase "evidence of indebtedness" as used in sections 53550, subdivision (b) and 53570, subdivision (b)(1). We therefore give the words in the definition " 'a plain and commonsense meaning' " (*San Diegans*, *supra*,

---

[14] Section 5700, which applies to title 1, division 6, chapter 9 addressing the sale of state bonds, states, " 'Bonds' as used in this chapter means (a) any bonds or other evidences of indebtedness issued after the effective date of this chapter by the state or any state department, board, agency or authority or (b) any bonds or other evidences of indebtedness issued by any joint powers agency created under Chapter 5 (commencing with [s]ection 6500) of [d]ivision 7 that are payable from payments made with respect to a lease or sale of property to or from the state or any state department, board, agency, or authority. For purposes of this chapter, 'evidence of indebtedness' includes, but is not limited to, certificates of participation or interests in any rental or lease payments or installment purchase payments, in an aggregate principal amount exceeding $10,000,000, to be made by the state or any state department, board, agency, or authority with respect to buildings or other capital improvements."

22

242 Cal.App.4th at p. 428), while considering them " ' "in the context of the statutory framework as a whole." ' " (*Id*. at p. 429.)

The phrase "other evidence of indebtedness" appears in sections 53550, subdivision (b) and 53570, subdivision (b)(1) in a list. "Established canons of statutory construction assist us in ascertaining the meaning of a term primarily defined by way of a list of examples and the meaning of examples enumerated on such a list." (*Harrod v. Country Oaks Partners, LLC* (2024) 15 Cal.5th 939, 952.) Under the doctrine of *ejusdem generis*, " '[w]hen a statute contains a list or catalogue of items,' " we " 'determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope.' " (*Friends of Oceano Dunes, Inc. v. San Luis Obispo County Air Pollution Control Dist.* (2015) 235 Cal.App.4th 957, 965 (*Friends of Oceano Dunes*).)

In section 53570, subdivision (b)(1) the phrase "other evidence of indebtedness" appears at the end of a list that reads "[b]onds, warrants, notes, or other evidence of indebtedness."[15] Black's Law Dictionary defines the term "bond" in various ways. The broadest definition states that "bond" means "[a]n obligation; a promise." (Black's Law Dict. (11th ed. 2019) p. 218, col. 1.) "[B]ond" is also more narrowly defined as "[a] written promise to pay money or do some act if certain circumstances occur or a certain time elapses; a promise that is defeasible upon a condition subsequent; esp., an instrument under seal by which (1) a public officer undertakes to pay a sum of money if he or she does not faithfully discharge the responsibilities of office, or (2) a surety

---

[15] Black's Law Dictionary does not define "evidence of indebtedness," but, rather, refers to the definition of "security" (Black's Law Dict., *supra*, at p. 703, col. 1) where the phrase appears in the definition of "security" from title 15 of the United States Code (Black's Law Dict., at p. 1626, cols. 1–2), addressing commerce and trade. Title 5 of the United States Code, which governs government organization and employees and, thus, is arguably of greater relevance to the question before us, does not define "evidence of indebtedness."

23

undertakes the responsibility to pay if the public officer so fails." (Black's Law Dict., at p. 218, col. 1.)

The term "warrant" is defined as, alternately, "[a] document conferring authority, esp. to pay or receive money" and "[a]n order by which a drawer authorizes someone to pay a particular sum of money to another." (Black's Law Dict., *supra*, at p. 1901, col. 2.) The term "note" is defined as "[a] written promise by one party (the *maker*) to pay money to another party (the *payee*) or to bearer" that "is a two-party negotiable instrument." (Black's Law Dict., at p. 1275, col. 2.)

The terms in the list that precede "evidence of indebtedness," are similar in that each refers to a written promise to pay or a direction to make specified payments.[16] However, they are not all negotiable—or transferable—instruments. For example, warrants are not always transferable. (See, e.g., *People ex rel. Barry v. Gray* (1863) 23 Cal.125, 126; *A.G. Spalding & Bros. v. Contra Costa County* (1936) 12 Cal.App.2d 262, 264; *People v. Mares* (2007) 155 Cal.App.4th 1007, 1015.) Moreover, California and its cities may use warrants to pay employees' salaries (see, e.g., *Lotts*, *supra*, 13 Cal.App.2d at p. 635; *Compton Community College*, *supra*, 165 Cal.App.3d at p. 86; *City of San Diego v. Dauer* (1893) 97 Cal. 442, 443–444), and employees' pensions constitute an element of their compensation (see, e.g., *Betts*, *supra*, 21 Cal.3d at p. 863; *Cal Fire*, *supra*, 6 Cal.5th at p. 985; *Westly v. Board of Administration* (2003) 105 Cal.App.4th 1095, 1105–1106 [noting that the state pays retirement funds via warrants]).

The city's unfunded liability derives from its pension obligations under the charter and municipal code and from its contractual obligations to its employees. These promises are written, and the right to payments under them are vested. As a result, they

---

[16] In other sections of the Government Code, the phrase "evidence(s) of indebtedness" also appears in lists that include all manner of promises, including bonds, notes, warrants, contracts, obligations, and judgments. (See, e.g., §§ 1095, 17700, 25210.6, 43740, 43744, 53511, 53570, 53822.)

are similar to the other listed items in the relevant definitions of "bonds" and "revenue bonds," using the narrower definition of "bond" denoting a written promise to pay money or do some act if certain circumstances occur.

Legislative history also supports a broader reading of "revenue bonds" than HJTA's narrow interpretation. Section 53570 originally defined " 'revenue bonds' " as "bonds, warrants, notes or other evidence of indebtedness of a local agency denominated revenue bonds under any law of this state and payable from funds other than the proceeds of ad valorem taxes or the proceeds of assessments levied upon property in the local agency." (Stats. 1972, ch. 531, § 15, p. 919.) The Legislature amended the definition in 1985 to remove the phrase "denominated revenue bonds under any law of this state," loosening the definition and removing the limitation on the phrase "other evidence of indebtedness." (Stats. 1985, ch. 1033, § 9, pp. 3422–3423.)

The choice of the broader, more flexible concept of indebtedness over the narrower and more restrictive terms of "securities" or "negotiable instruments" in the "revenue bonds" definition suggest a legislative intent to broaden a city's authority to refund indebtedness beyond that of refunding of bonds, securities, or negotiable instruments. (See, e.g., *Carman*, *supra*, 31 Cal.3d at p. 328 [" '[A]ny indebtedness' can include all obligations to pay money, whether or not evidenced by bonds, notes, or security."].) Further, section 53570 was amended only one year after the decision in *Coster*. The Legislature is deemed to be aware of statutes and judicial decisions already in existence and to enact or amend statutes in light of them. (*River's Side at Washington Square Homeowners Assn. v. Superior Court* (2023) 88 Cal.App.5th 1209, 1235.) While the statute examined in *Coster* is not directly applicable, that the opinion concluded " 'evidence of indebtedness' " includes " 'all contractual obligations to pay in the future for consideration presently received' " (*Coster*, *supra*, 151 Cal.App.3d at p. 1193), supports a broad reading of the phrase in section 53570.

25

We conclude that the phrase "other evidence of indebtedness" may include unfunded liability as it is understood here, a representation of a city's deferred obligation to pay its employees. Such an interpretation neither renders the other instruments on the list redundant, nor makes "evidence of indebtedness" " 'markedly dissimilar' " to those other instruments. (See *Friends of Oceano Dunes*, *supra*, 235 Cal.App.4th at p. 965.)

The proceeds of refunding bonds issued pursuant to section 53583 "may be applied to the . . . redemption of the bonds to be refunded either at their earliest redemption date or dates, any subsequent redemption date or dates, upon their purchase or retirement maturity, or paid to a third person to assume the local agency's obligation to make the payments."[17] (§ 53584.) The statute allows the city to issue bonds for the purpose of refunding the city's indebtedness, here, in the form of the unfunded liability, and grants the city flexibility with respect to the timing of the refunding of the unfunded liability.

The refunding of the unfunded liability using the proceeds from the refunding bonds converts the debt represented by the unfunded liability into debt in the form of bonds. Such refunding does not create new debt.[18] As our Supreme Court has consistently held, "merely to fund or refund an existing debt is not to 'incur an indebtedness or liability.' A bond is not an indebtedness or liability—it is only the evidence or representative of an indebtedness; and a mere change in the form of the *evidence* of indebtedness is not the creation of a new indebtedness within the meaning of

---

[17] "[R]edemption" has been broadly defined as " '[t]he payment of principal and unpaid interest on bonds *or other debt obligations*.' " (*Carman*, *supra*, 31 Cal.3d at p. 327, citing Black's Law Dict. (5th ed. 1979) p. 1149.)

[18] The city has indicated that the cost of issuing the bonds will be paid from the bond proceeds. This action is authorized pursuant to section 53556, which reads, in relevant part: "The designated costs of issuing the refunding bonds may be paid by . . . the proceeds of sale of the refunding bonds" or "the interest or other gain derived from the investment of any of the proceeds of sale of the refunding bonds." Section 53587 gives the city the discretion to include such refunding bond issuance costs in determining the amount of refunding bonds to issue.

the constitution." (*Teed*, *supra*, 112 Cal. at p. 327; see also *Lisenby*, *supra*, 180 Cal. at p. 59.)

In *Lisenby*, the charter city of Long Beach was obligated to pay a judgment to persons injured in the collapse of a public building. The city adopted an ordinance to provide for the issuance of a bond to refund the indebtedness that resulted from that judgment. (*Lisenby*, *supra*, 180 Cal. at pp. 54–55.) The city's mayor and treasurer refused to sign the bond on the grounds that doing so would cause the city to incur debt in violation of the constitutional debt limitation. (*Id*. at p. 55.) Our Supreme Court disagreed, concluding that the refunding of the city's existing debt, which arose "by operation of law," is exempt from the constitutional debt limitation. (*Id*. at p. 59.) In reaching this conclusion, the Supreme Court stated, "To 'fund' an outstanding debt of a municipal corporation which is payable presently or at short periods is to convert such indebtedness into a more permanent form with an extended time of payment and with interest which is regular and which may also be reduced. The usual method of 'funding' such a debt is by the issuance of bonds." (*Ibid*.) The debt represented by the judgment was converted to a debt represented by the bond obligations.

For the reasons explained above, we have decided that the debt the city seeks to refund already exists, in the form of the unfunded liability. The issuance of bonds will refund and convert the existing debt into a different form. We conclude the city has this authority under section 53583, subdivision (a), and we reject HJTA's arguments to the contrary.

### III. DISPOSITION

The judgment is affirmed. Respondents are awarded costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

27

_____
                                Danner, J.


WE CONCUR:




_____
Greenwood, P. J.




_____
Bromberg, J.




**H050889**
*The City of San Jose v. Howard Jarvis Taxpayers Association et al.*

| Trial Court: | Santa Clara County Superior Court |
| --- | --- |
| Trial Judge: | Hon. Sunil R. Kulkarni |
| Counsel for Defendants and Appellants Howard Jarvis Taxpayers Association, Citizens for Fiscal Responsibility and Pat Waite: | Jonathan M. Coupal<br>Timothy A. Bittle<br>Laura E. Dougherty<br>Howard Jarvis Taxpayers Foundation |
| Counsel for Plaintiff and Respondent The City of San Jose: | Allison E. Burns<br>Brian P. Forbath<br>Gregory J. Maestri<br>Stradling Yocca Carlson & Rauth |

**H050889**
***The City of San Jose v. Howard Jarvis Taxpayers Association et al.***